C:\Documents and Settings\David\My Documents\WordPerfectDocts\WeldingRods\04cv17033a-ord(Chen-IME).wpd

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **EDDIE & JOYCE BYERS,** | : | Case No. 1:04-CV-17033 |
| Plaintiffs, | : | |
| v. | : | |
| **LINCOLN ELECTRIC CO., et al.,** | : | |
| | : | Judge Kathleen M. O'Malley |
| Defendants | : | |
| | : | **MEMORANDUM & ORDER** |
| | : | |

Defendants in this product liability action seek an Order from the Court allowing them to undertake an independent medical examination ("IME") involving electrophysiological testing of plaintiff Eddie Byers. For the reasons and under the conditions stated below, the motion (docket no. 87) is **GRANTED**.

**I.    Legal Standard.**

The propriety of granting defendants' motion to examine Mr. Byers is governed by Fed. R. Civ. P. 35. This rule states, in pertinent part:

> When the mental or physical condition . . . of a party . . . is in controversy, the court in which the action is pending may order the party to submit to a physical or mental examination by a suitably licensed or certified examiner . . . . **The order may be made only on motion for good cause shown** and upon notice to the person to be examined and to all parties and shall specify the time, place, manner, conditions, and scope of the

examination and the person or persons by whom it is to be made.[1]

As suggested by the highlighted language, the principal question raised by a Rule 35 motion for IME is whether the movant has shown good cause.

The Supreme Court has discussed the Rule's "good cause" requirement, explaining: "The specific requirement of good cause would be meaningless if good cause could be sufficiently established by merely showing that the desired materials are relevant, for the relevancy standard has already been imposed by Rule 26(b). Thus, by adding the words '* * * good cause * * *,' the Rules indicate that there must be greater showing of need under Rules 34 and 35 than under the other discovery rules."[2] Other courts have explained that the "'in controversy' and 'good cause' requirements [of Rule 35] are not simple formalities and are met neither by the 'mere conclusory allegations of the pleadings – nor by mere relevance to the case – but require an affirmative showing by the movant that each condition as to which the examination is sought is really and genuinely in controversy and that good cause exists for ordering each particular examination.'"[3]

Further, even assuming the movant has met both the "in controversy" and "good cause" requirements, "it is still within the court's discretion to determine whether to order an examination."[4] When "determining what kinds of examinations to authorize, the court must balance the desire to insure the safety and freedom from pain of the party to be examined against the need for the facts in the interest

---

[1] Fed. R. Civ. P. 35(a) (emphasis added).

[2] *Schlagenhauf v. Holder*, 379 U.S. 104, 118 (1964) (quoting *Guilford Nat'l Bank of Greensboro v. Southern Ry. Co.*, 297 F.2d 921, 924 (4th Cir. 1962)).

[3] *Curtis v. Express, Inc.*, 868 F.Supp. 467, 469 (N.D.N.Y. 1994) (quoting *Schlagenhauf*, 379 U.S. at 118); *see Goodman v. Harris Cty.*, 443 F.3d 464, 469 n.6 (5th Cir. 2006) (same).

[4] *Curtis*, 868 F.Supp. at 468.

of truth and justice."[5] Many courts employ a burden-shifting approach when determining whether to authorize a potentially risky or painful medical examination of a party. If the movant has shown good cause for a medical examination, the potential examinee who seeks to avoid the examination must make a prima facie showing that the proposed test is potentially dangerous or painful. If the examinee satisfies this initial burden, the burden shifts to the movant to demonstrate the need for the examination and its safety.[6]

Finally, it is notable that Rule 35 "does not limit the number of examinations."[7] "Each request for an independent medical examination must turn on its own facts, and the number of examinations to which a party may be subjected depends solely upon the circumstances underlying the request."[8] If a "complex or permanent injury is at issue," it may be more appropriate for the parties "to seek opinions from 'several medical specialties' in order to conduct a proper causation analysis."[9] On the other hand, "the number of examinations ordered should be held to the minimum necessary considering the party's right to privacy and the need for the court to have accurate information."[10] Thus, a court may "require a stronger showing

---

[5] 8A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* §2235 at 494 (2nd ed. 1994).

[6] *Pena v. Troup*, 163 F.R.D. 352, 353 (D. Colo. 1995) (citing *Lefkowitz v. Nassau Cty. Med. Ctr.*, 94 A.D.2d 18 (1983)).

[7] *Peters v. Nelson*, 153 F.R.D. 635, 637 (N.D. Iowa 1994).

[8] *Id.*

[9] *Continental Cas. Co. v. United States*, 2004 WL 2216528 at *3 (N.D. Cal. Sept. 30, 2004). *See Sice v. Oldcastle Glass, Inc.*, 2005 WL 82148 (D. Colo. Jan. 10, 2005) (in a case where the plaintiff was injured when a load of glass fell on her, granting a defense motion for five separate IMEs by an orthopedist, a neuro-ophthalmologist, a neuropsychologist, a psychiatrist, and an examiner of functional capacity).

[10] *Vopelak v. Williams*, 42 F.R.D. 387, 389 (N.D. Ohio 1967).

of necessity before it will order . . . repeated examination."[11]

## II. Background and Analysis.

Mr. Byers alleges his exposure to the manganese contained in welding fumes has caused him a parkinsonian neurological injury. In addition to symptoms of bradykinesia (slowness of movement), rigidity, tremor, and impairment of balance and gait, Mr. Byers' treating doctors have also noted that Mr. Byers exhibits "myoclonic jerks." Myoclonic jerks are sudden, involuntary twitches of a muscle or group of muscles.[12]

Mr. Byers' current treating neurologist, Dr. Nicholas, has opined that Mr. Byers is suffering from a parkinsonian syndrome that: (1) is caused, at least in part, by exposure to manganese; and (2) is organic, not "psychogenic." In contrast, Dr. Lang, a neurologist hired by defendants to examine Mr. Byers, has opined that Mr. Byers is suffering from a psychogenic movement disorder and that none of his symptoms are organic in origin. More particularly, Dr. Lang believes Mr. Byers' myoclonic jerks are psychogenic, not organic.[13]

With their present motion, defendants seek permission for their expert neurophysiologist, Dr.

---

[11] *Id.*

[12] Simple, familiar examples of myoclonic jerks are hiccups, or "sleep starts" that sometimes occur when a person drifts off to sleep. Mr. Byers' myoclonic jerks, of course, are far more involved.

[13] A disease or set of symptoms is "psychogenic" if it is mental or emotional in origin, while it is "organic" if it is physiological in origin. Thus, two different persons experiencing the same set of symptoms may have the same disease (e.g., erectile dysfunction), but the origin of one person's symptoms may be physiological (e.g., blood vessel deterioration), while the origin of the other's may be psychological (e.g., depression). Dr. Nicholas believes Mr. Byers' symptoms are caused by physical damage to parts of Mr. Byers' brain (which, in turn, was caused in whole or in part by exposure to manganese), while Dr. Lang believes Mr. Byers' symptoms are mental or emotional in origin and not the product of any physical brain damage.

Robert Chen, to undertake electrophysiological testing of Mr. Byers for the purpose of helping to determine whether his myoclonic jerks are psychogenic or organic.  Defendants explain that electrophysiological testing is a non-invasive procedure where electrode-sensors are placed on the patient's scalp and skin to record the electrical activity in the patient's brain and muscles.[14]  This type of electrophysiological testing is non-invasive, safe, and generally not uncomfortable.  Defendants further explain that, by measuring the patterns of electrical activity associated with Mr. Byers' myoclonic jerks, Dr. Chen may assess whether those jerks are psychogenic or organic.  For example, electromyographic examination has shown that "[m]yoclonus with EMG bursts of long duration (usually more than 70 ms) are compatible with psychogenic myoclonus.  In contrast, jerks with EMG bursts of short duration (less than 70 ms) are typical of organic myoclonus."[15]  Similarly, electroencephalographic examination has shown that "[a] slow negative potential on EEG, beginning at least 800 ms prior to the jerk and with maximum amplitude at the vertex, is a feature of many cases of psychogenic myoclonus.  This type of slow negative potential is not seen in organic myoclonus."[16]

Mr. Byers objects to this examination on several grounds.  First, Mr. Byers notes that electrophysiological testing is not conclusively diagnostic of psychogenic myoclonus.  One reason this is true is that there are methodological limitations to EEG and EMG testing – the necessary technique of "back-averaging" to measure "premovement potential" does not work with certain patients and is

---

[14] The electrophysiological tests contemplated by defendants include: (1) electromyography ("EMG"), which measures electrical activity in muscles; (2) electroencephalography ("EEG"), which measures electrical activities in the brain and is used in correlation with EMG measurements of muscle activity; and (3) accelerometry, which measures the movement of a patient's limb through space and may (for example) differentiate various types of tremors and jerks.

[15] Chen declaration at ¶10.

[16] *Id.*

susceptible to error. Another reason is that even error-free electrophysiological measurements are not absolutely definitive; the measurements can be *helpful* in distinguishing organic jerks from psychogenic jerks, but they are only suggestive and must be interpreted as part of a broader clinical assessment. Indeed, Mr. Byers notes, some of the leading researchers in this area (including experts cited by defendants in other *Welding Fume* cases) have diagnosed psychogenic myoclonus *without* electrophysiological testing. In sum, electrophysiological testing is neither necessary nor sufficient to diagnose psychogenic myoclonus. Mr. Byers argues that, since he has already submitted by agreement to a two-hour-long physical IME by defendants' expert neurologist, Dr. Lang, defendants already have all the data they need to assess his physical condition and he should not have to undergo a second IME.

Taking this point one step further, Mr. Byers observes that this first IME allowed Dr. Lang to reach a conclusion that his myoclonus is psychogenic and not organic. Mr. Byers asserts that, regardless of what Dr. Chen's testing may show, Dr. Lang has made a final diagnosis and he is not going to change his opinion. Defendants do not disagree with this assertion. Defendants do respond, however, that the results of Dr. Chen's test are not preordained and may yield fodder for cross-examination by plaintiffs, just as the results may (as defendants' expect) yield data supportive of Dr. Lang's opinion.[17]

Mr. Byers also argues that Dr. Chen's test is so limited in scope – because it analyzes only Mr. Byers' myoclonus, and not his other symptoms, such as tremor and rigidity and bradykinesia – that it has, in the end, very limited diagnostic value to either side. Defendants disagree with this assessment and also note that, in fact, the electrophysiological testing may also provide useful diagnostic data regarding Mr. Byers' tremor, not just his myoclonus.

---

[17] Indeed, according to literature cited by Dr. Chen, only about 20% of patients with myoclonus are diagnosed as having a psychogenic etiology.

6

Having reviewed carefully all of the parties' arguments, the Court concludes that defendants have carried their burden of showing good cause for the proposed electrophysiological testing by Dr. Chen. Dr. Chen's testing will not be duplicative of Dr. Lang's own observations; rather, it will complement Dr. Lang's IME. Further, the methodological limitations with Dr. Chen's tests identified by Mr. Byers are not any more serious than those inherent in many other, useful, empirical medical examinations; and the same is true for the extent to which Dr. Chen's test results are merely helpful diagnostic tools, rather than final, conclusive indicators. Ultimately, Dr. Chen's tests may provide relevant and valuable evidence directed at the most critical question in this case: causation. Given the complexity of Mr. Byers' alleged injuries, defendants do not ask too much to obtain this evidence through a second IME.

Critical to the Court's conclusion is the fact that the proposed electrophysiological testing will not be psychologically or physically invasive of Mr. Byers, nor is it at all unsafe; and at the same time there is a general consensus in the medical community that the tests can help with diagnosis. These circumstances are in contrast, for example, to fluorodopa PET scans, which some investigators contend may help differentiate idiopathic parkinson's disease from manganese-induced parkinsonism.[18] Not only do such brain scans require the patient to suffer injection with a radioactive substance, but the diagnostic usefulness of fluorodopa PET scans is questionable, at best.[19]

---

[18] *See In re Welding Fume Prods. Liab. Litig.*, 2006 WL 4507859 at *26-27 (N.D. Ohio Aug. 8, 2006) (discussing neuroimaging techniques).

[19] *Id.* at *30 n.67 ("Biomarkers used as diagnostic tests . . . must not only have biologic relevance but also a strong linkage to the clinical outcome of interest. No radiotracers fulfill these criteria, and current evidence does not support the use of [neuro-]imaging as a diagnostic tool in clinical practice or as a surrogate endpoint in clinical trials. * * * Although there is increasing use of diagnostic imaging by investigators, currently it is not recommended that [dopamine transporter markers] and other tracers be used routinely in the diagnosis of PD or other parkinsonian syndromes.") (quoting Bernard Ravina, et al., *The Role of Radiotracer Imaging in Parkinson's Disease*, 64 Neurology 208, 208, 211 (2005)).

In light of all of these factors, the Court grants defendants' motion as follows. Defendants state they are willing to pay for the costs of the examination, and also to travel to a location near Mr. Byers' home to perform the IME. The Court Orders this to be so. Further, Dr. Chen will perform the testing on Mr. Byers as soon as reasonably possible and at a time that both he and Mr. Byers find convenient. The testing shall not take any longer than necessary and in no event longer than three hours. Dr. Chen will not perform any other type of testing or examination of Mr. Byers. No counsel may be present during the examination. The parties shall agree on other particulars as necessary, with the help of the Special Master if required.

Finally, the Court notes that it does not here address in any way the question of admissibility of any of the evidence that Dr. Chen obtains, nor any portion of Dr. Chen's opinions that rely on such evidence.

**IT IS SO ORDERED.**

/s/ Kathleen M. O'Malley
**KATHLEEN McDONALD O'MALLEY
UNITED STATES DISTRICT JUDGE**

**DATED**: August 5, 2008