04cv17033c-Ord(Pretrial Motions).wpd

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| **EDDIE & JOYCE BYERS,** | : | **Case No. 1:04-CV-17033** |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| v. | : | |
| | : | |
| **LINCOLN ELECTRIC CO., et al.,** | : | |
| | : | **Judge Kathleen M. O'Malley** |
| **Defendants** | : | |
| | : | |
| | : | **MEMORANDUM & ORDER** |
| | : | |

Section I.

On October 22-23, 2008, the Court held hearings on the record on the pretrial evidentiary motions filed in this case, and entered rulings on many of those motions. This Section I of this Order documents those rulings made at the final pretrial hearing, *solely* for the purpose of ensuring the docket no longer shows the motions as pending. For the reasons and to the extent stated on the record, and with the conditions and caveats there explained, the Court ruled as follows:[1]

---

[1] All denials of motions regarding admissibility are without prejudice to the parties' right to raise appropriate objections at trial and on appeal. This Order merely documents the Court's rulings in highly simplified fashion; the full contours of the Court's rulings were set out on the record during the hearing, and during previous hearings in this MDL, all of which are incorporated into this record by reference.

**Dkt. 199**  Byers' Omnibus Motion in Limine to Exclude Various Evidence is **granted in part and denied in part**. (See also the discussion of this motion in Section II of this Order.)

**Dkt. 244**  Byers' Motion to Exclude Evidence re: Social Security Preliminary Disapproval of Benefits is **granted in part**.

**Dkt. 258**  Byers' Motion to Exclude Testimony of Joyce Byers is **granted in part and denied in part**.

**Dkt. 261**  Byers' Motion to Exclude the Testimony of Jane Welch is **granted as unopposed**.

**Dkt. 268**  Byers' Supplemental Omnibus Motion in Limine is **granted in part and denied in part.**

**Dkt. 277**  Byers' Motion to Exclude Testimony of Dr. Perl is **granted in part and denied in part.**

\*     \*     \*     \*     \*

**Dkt. 178**  Defendants' Motion to Exclude the Testimony of Various Experts is **granted in part and denied in part**.

**Dkt. 187**  Defendants' Motion to Exclude the Testimony of Dr. A.L. Ridgeway is **denied**, without prejudice to objection to specific designations.

**Dkt. 188**  Defendants' Motion in Limine to Exclude Other Companies' Documents is **denied**.

**Dkt. 189**  Defendants' Motion in Limine to Exclude Reference to Prior Court Orders is **granted as unopposed**.

**Dkt. 190**  Defendants' Motion in Limine to Exclude Reference to Defendants' Earlier Denials of Requests for Admission is **granted as unopposed**.

**Dkt. 191**  Defendants' Motion in Limine to Exclude Reference to Defendants' Response to Motion for Court-Ordered Epi-Study is **granted as unopposed**.

**Dkt. 192**  Defendants' Motion in Limine to Exclude Reference to Tobacco and Asbestos Industries is **granted**.

**Dkt. 193**  Defendants' Motion in Limine to Exclude Plaintiffs' Animations is **granted in part and denied in part**.

**Dkt. 194**  Defendants' Motion in Limine to Exclude Reference to Defendants' Warnings Issued After Byers' Last Welding Fume Exposure is **denied**.

2

**Dkt. 195**    Defendants' Motion in Limine to Exclude Reference to Hardfacing is **denied**.

**Dkt. 196**    Defendants' Motion in Limine to Exclude Reference to Lobbying by Defendants is **denied**.

**Dkt. 197**    Defendants' Motion in Limine to Exclude Reference to "Historical Documents"is **denied**.

**Dkt. 200**    Defendants' Motion in Limine to Exclude Reference to Religious Matters is **denied**.

**Dkt. 201**    Defendants' Motion in Limine to Exclude Reference to Lawsuit Against Yale University is **granted as unopposed**.

**Dkt. 203**    Defendants' Motion in Limine to Exclude Reference to Settlements of Other Welders' Claims is **granted**.

**Dkt. 204**    Defendants' Motion in Limine to Exclude any Suggestion that Byers' Asbestosis and Heart Conditions are Caused by Welding Fumes is **granted**.

**Dkt. 206**    Defendants' Motion in Limine to Exclude Evidence of Preparation of Expert Reports is **granted as unopposed.**

**Dkt. 209**    Defendants' Motion in Limine to Exclude Evidence of Other Welding Fume-Related Claims, and the *Tamraz* and *Jowers* Verdicts, and Expert Testimony Regarding Other Claims and Diagnoses is **granted in part and denied in part.**

**Dkt. 275**    Defendants' Motion to Exclude Exhibit 9216 & Testimony re: Ruben Aroyo is **granted**.

**Dkt. 279**    Defendants' Motion to Exclude Burns Videotaped Deposition is **granted**.

Section II.

In addition to the motions addressed above, the Court also heard argument at the final pretrial hearing on other motions, but reserved ruling for later. Before trial started, the Special Master conveyed to the parties (via email) the Court's rulings on these reserved motions, with the promise that the Court would make a record of those rulings. This Section II of this Order documents the Court's rulings on the reserved motions and other issues.

Dkt. 176    Byers' Motion to Exclude the Testimony of Dr. Gordon Sze is **granted in part and denied in part**, as follows.
    First, regarding Dr. Sze's opinion that "it takes less manganese deposition in the brain to be seen

3

on an MRI than it does to cause symptoms of manganism" – or, in other words, a welder can have a "lit-up MRI" but no symptoms: Dr. Sze may opine that he is aware, both from his review of the literature and from his own experience, that patients have had MRIs which light up for the presence of manganese even though they are asymptomatic for manganism or MIP. Dr. Sze can also opine that he personally infers from these facts that something more by way of exposure is needed to cause symptoms than is needed to light up an MRI.

Opinions as to *how much* more exposure is necessary to cause symptoms, however, are purely speculative and will not be allowed. Plaintiffs may cross-examine Dr. Sze regarding whether his inference that "'something more' is necessary to cause symptoms" is a fair inference, or even a logical one (as plaintiffs' counsel argued at the final pretrial hearing).

Second, regarding Dr. Sze's opinion that "Byers' 2002 MRI test results rule out manganism": Plaintiffs' motion is granted and Dr. Sze may not offer this opinion, as so phrased. The Court so rules because: (a) Dr. Sze has never expressed this specific opinion before (and he will not be permitted to express any opinions for the first time at trial); and (b) defendants have represented that Dr. Sze will not express that opinion at trial (and Dr. Sze will be bound by that representation).

Third, regarding Dr. Sze's opinion that, "while theoretically possible, it is 'highly unlikely' that a welder who was once exposed to sufficient levels of manganese to cause MIP would ever have a normal MRI thereafter, if his exposures have not ceased": Dr. Sze may opine he believes it is fair to infer from the absence of any examples of this happening in the literature or in his personal experience, that it is unlikely to happen, or even 'highly unlikely' to happen. Dr. Sze may not, however, express any opinions regarding: (1) Byers' own exposure levels, or (2) how likely or unlikely it may be that Byers' scenario is the "theoretically possible" circumstance or the "unlikely" circumstance. The Court so rules because Dr.

4

Sze has stated he has no knowledge of Byers' exposure levels and he has never expressed an opinion on the impact of those particular exposure levels on Byers' MRI results. Again, the question of whether Dr. Sze's inferences, drawn from the absence of examples in the literature or his experience, are fair inferences, is for cross-examination.

Finally, plaintiffs' request that the Court script many of Dr. Sze's responses and allow a 'night-before' deposition is denied.

Dkt. 177  Byers' Motion to Exclude the Testimony of Dr. Brent Furbee is **granted in part and denied in part**, as follows.
Dkt. 260  Byers' Motion to Exclude the Testimony of Dr. Lee Blum is **granted in part and denied in part**, as follows.

First, regarding Dr. Furbee's opinion that Byers does not have manganism, and that his symptoms are inconsistent with manganism: Dr. Furbee may testify he believes Byers does not have manganism *because* Byers' exposure levels could not have reached the very high levels (e.g. 30.0 mg/m$^3$) that Dr. Furbee believes are necessary to cause MIP. Dr. Furbee may not testify, however, he believes Byers does not have manganism *based on* Byers' actual exposures, because Dr. Furbee does not know this information. And Dr. Furbee may not testify he believes Byers does not have manganism *based on* Byers' symptoms, because Dr. Furbee is not qualified to so opine, as he is not a neurologist and has not examined Byers.

On cross-examination, plaintiffs may confirm that: (1) Dr. Furbee is not purporting to express opinions regarding Byers' symptomatology; and (2) in the normal course of his practice, Dr. Furbee would refer patients to neurologists for purposes of diagnosis. In fairness to Dr. Furbee, however, plaintiffs will not be permitted to imply a lack of qualifications to assess symptoms, or to make an initial determination in a patient before him as to whether those symptoms might be indicative of a particular disease, condition

5

or syndrome (and thus might justify a referral to a neurologist, for instance). While Dr Furbee did not do that kind of assessment in this case, he is certainly qualified to do so and apparently regularly does so in other cases.

Second, regarding Dr. Furbee's opinion that it has not been proved that welding fumes can cause neurological injury: Dr. Furbee may testify he does not believe this is proved based on his review of the literature; however, he may not testify that he has personally concluded there is no connection between welding fume exposure and neurological injury, as he has not done any independent toxico-neurological studies. Essentially, the Court's ruling in *Jowers* on this question continues to apply. This ruling does not represent a substantial narrowing of Dr. Furbee's opinions; it only ensures he must make clear the basis therefor.

Third, regarding Dr. Furbee's opinion that a person must suffer exposures of 30.0 mg/m$^3$ before he can get manganism: Dr. Furbee is permitted to give this opinion, as it is based on his review of the literature.

Fourth, regarding Dr. Furbee's opinion that the Mayo Labs' reference range for normal manganese blood serum levels is wrong, and the high end of the range should be 3.0 ug/m$^3$: Dr. Furbee can testify that other labs and medical articles use different reference ranges, and he can discuss the upper limits of those ranges. But Dr. Furbee cannot reach the final conclusion that the *correct* upper limit that all of these labs and articles should be using is a specific number, such as 2.9 or 3.0, because he concedes he has no scientific basis upon which to specify a precise limit. Similarly, Dr. Furbee can opine that these other labs' upper ranges suggest Byers' manganese serum is within the normal range and not high, but he may not opine that Mayo is using a "too low" or "wrong" upper limit. The same limitations apply to Dr. Blum.

Fifth, regarding Dr. Furbee's opinions that: (a) there have been no additional manganism cases

6

arising from the Taiwan smelting plant since the time the original "Taiwanese Cohort" was discovered in 1980; and (b) the asymptomatic workers discussed in Dr. Kim's 1999 article about the Taiwanese smelting plant remain asymptomatic today: Dr. Furbee is permitted to opine that: (1) no additional cases of manganism were ever *reported*, and (2) if additional cases had occurred, he believes they probably would have been reported.

**Dkt. 199** Byers' Omnibus Motion in Limine to Exclude Various Evidence.

With this motion, plaintiffs addressed the admissibility of dozens of pieces and categories of evidence. As noted above, the Court granted this motion in part and denied it in part. Although the Court ruled on most of the issues raised in this motion at the final pretrial conference, the Court also reserved ruling on several other issues; further, the parties raised some secondary, "follow-up" questions after the Court issued its rulings at the final pretrial conference. The rulings below address these reserved issues and follow-up questions.

• *Rule of Completeness* – Defendants seek to introduce a portion of an expert report issued by defendants' Industrial Hygiene expert, Mr. Chute, in a different welding fume case – that of Charles Ruth. Mr. Chute's report expressed opinions relating to the welding fume exposures of Mr. Ruth, who was diagnosed as having MIP. Defendants seek to present deposition testimony from Mr. Chute, relying upon the "rule of completeness" to overcome the otherwise obvious hearsay bar to the proffering of a party's own out-of-court statements. The plaintiffs object to defendants' proposed evidence. Those portions of Mr. Chute's Industrial Hygiene *expert report* regarding Ruth that outline the assumptions he made in reaching his conclusions are admissible under the rule of completeness. The proposed portions of Chute's *deposition transcript* are not

7

admissible, however, as the rule of completeness does not apply to statements offered to contradict or expand upon those appearing in the report. The same is even more true regarding statements contained in Ruth's deposition transcript, as they cannot possibly "complete" Chute's opinions. Industrial Hygiene expert Ewing's report on Ruth is admissible against plaintiffs as an admission, as he is one of plaintiffs' core experts.

- *Flier Seen by Byers* – defendants state they will not seek admission of the lawyer-advertising flier(s) at issue, in light of the timeline submitted by plaintiffs showing that Byers did not see a flier until after he was diagnosed with a movement disorder.[2] However, the Court INSTRUCTS plaintiffs to immediately inquire further of Mr. & Mrs. Byers and the Nakamura law firm to determine how it came about that Byers contacted the Nakamura firm in the first place; and to inform defendants and the Court of same.

- *"Other Injury" Testimony and Lawyer Advertising* – plaintiffs' motion for reconsideration is granted. Having read the testimony of all 12 safety management workers who were asked by defendants about the existence of neurological injury to other welders, and who were then asked by plaintiffs whether a welder would likely report a neurological injury if he did not know it was work-related: the Court concludes the plaintiffs' questioning did not open the door to additional evidence that lawyer advertising did give workers reason to know, after 2002, that neurological injury to welders might be work-related; and further concludes the additional evidence of lawyer advertising defendants seek to adduce is not admissible under Rule 403.

- *Mother's Depression* – defendants' motion for reconsideration is granted, and plaintiffs'

---

[2] Defendants, however, preserve their underlying objection to the Court's ruling that such fliers listing the alleged symptoms of MIP are not admissible in cases where the plaintiff did not see a flier before he was diagnosed with parkinsonism.

subsequent motion for reconsideration is denied. Having reviewed in more detail the statements documented in Byers' doctors' notes, the Court concludes defendants may make reference to Byers' mother's alleged depression. Plaintiffs may point out that these statements by Byers do not show his mother was ever diagnosed with clinical depression; plaintiffs may also assert the statements are not accurate documentations of what Byers told his doctors, if there is a good-faith basis for so asserting. Submission by plaintiffs of an affidavit from Byers' mother, well after the discovery period has closed, does not alter the Court's analysis.

- *Daily Stressor Depression Evidence* – plaintiffs' objections to the admissibility of this evidence are overruled. Defendants may make reference to "daily stressors" in Byers life, both for the purpose of arguing these stressors caused a psychogenic parkinsonism, and also for arguing they are alternative / additional causes of his symptoms.

- *Danish/Swedish Studies* – the materials contained in the "three binders" submitted by defendants that are related to these studies may not be introduced by defendants. In general, these documents are not the type of materials that are reasonably relied upon by experts in forming the opinions at issue; further, defendants have failed to show that any expert actually relied upon any of these materials in forming their expressed opinions. Defense counsel's own input into, and participation in, exchanges between the authors of these studies provides further support for the Court's decision to exclude them.

- *Scope of Funding by Defendants* – The Court concludes that the information related to payments by defendants to experts who wrote articles and conducted studies is highly probative, but that safeguards need to be put into place to ensure the introduction of this evidence is not repetitive or overstated. Accordingly, in light of Fed. Rules of Evid. 403 & 611: (1) if a defense expert

9

specifically relies upon an article/study in his deposition or trial testimony, or in the body (not merely reliance list) of his report, or if defense counsel refers specifically to an article/study with any witness, then plaintiffs may adduce evidence of all payments made by defendants to the author(s) of that article/study; (2) if the basis of a defense expert's opinions is largely a literature review (e.g., Dr. Furbee), plaintiffs may adduce evidence of all payments made by defendants to the author(s) of any individual article/study on that witness's reliance list; (3) in no case may plaintiffs refer to any exact total of payments made by defendants to groups of authors (e.g., the entire total of payments made, or the total for a given reliance list), except a generic reference such as "tens of thousands" or "millions."

The Court further notes there will be admitted some evidence regarding other lawsuits, including those filed by Byers' co-workers without their knowledge; defendants will be permitted in this case to make a single reference (not in opening statement) to note that defendants' funding decisions included their knowledge of the existence of other baseless lawsuits.

- *Swash as Core Expert* – the motion by defendants to treat Dr. Swash as a core expert, which would make his testimony from prior cases admissible in this case, is denied. At this juncture, Dr. Swash's involvement in this MDL in particular, and in welding fume litigation generally, is not substantially more than many other experts who are also not core experts.

**Dkt. 184** Defendants' Motion to Exclude the Testimony of David Kahane is **granted in part and denied in part**.

As to certain of Mr. Kahane's opinions (e.g., business ethics and legal conclusions regarding defendants' compliance with HazCom), the motion is granted for reasons stated on the record at the final pretrial conference. As to Mr. Kahane's other opinions, regarding which the Court reserved ruling at the

10

final pretrial conference, the motion is denied; the Court's review of his opinions and the bases therefor convinces the Court those opinions are sufficiently reliable to be admitted.

**Dkt. 198**   Defendants' Motion in Limine to Exclude Reference to Individual Susceptibility is **denied**.

Plaintiffs are not arguing (and may not) that Byers, himself, is individually susceptible; and the concept generally is relevant and admissible, as discussed by defendants' own documents and experts. To the extent the defendants are concerned the jury will infer Byers is individually susceptible, defendants can clarify this on cross.

**Dkt. 202**   Defendants' Motion in Limine to Exclude Reference to Dr. Lang's Diagnoses of Other MDL Plaintiffs is **granted**.

The Court concludes that, at this precise juncture, the other diagnoses of defense expert neurologist Dr. Lang are inadmissible, because the number of his other diagnoses of psychogenic parkinsonism does not provide a sufficient basis to show bias, and the "trial within a trial" concern raised by Rules 403 and 611 is substantial. The weight of these factors, however, may change in the future.

Dkt. 210   Defendants' Motion for Clarification Regarding Admissibility of Testimony on Characterization of Manganese in Welding Fumes is **granted in part**, as follows.

This motion is premised on a mis-characterization of the Court's prior rulings addressing what various witnesses may and may not say regarding the constituents of welding fumes and how those constituents affect welders. Indeed, as plaintiffs note, if this issue is as important and scientifically sound as defendants now claim, defendants could and should have designated an expert qualified to explain the full scope of the bio-chemistry and bio-physics of manganese in welding fume – that is, not just what the

11

composition of welding fumes is, but *why that is meaningful* from a medical (bio-availability) standpoint. Defendants have not proffered such an expert in this case; the closest they have come is Dr. James Bennett, who is no longer listed in this case. Defendants' efforts to make this an issue at trial without actually providing the appropriate expert scientific/medical bases to support doing so are not permissible.

More specifically, as for Dr. Furbee, while he may be qualified to opine on welding fume constituents and their bio-availability (a point not decided here), he offered very few actual opinions on this topic in his report. Dr. Furbee is permitted to state at trial what he said in his report and in his deposition on this issue, but that is not anywhere close to what defendants seek with their present motion. As for Mr. Lyttle, there are two issues. First, it is not appropriate to let a fact witness express *opinions* on a scientific subject – especially one as central to the issues as defendants state these opinions are – without having first issued an expert report and being subjected to challenge in connection therewith. Second, while it may be true that Mr. Lyttle is qualified to testify about the constituents in welding fumes, nothing in his background renders him qualified to opine regarding the impact on bioavailability flowing from the chemical and physical properties of the manganese compounds, which (as defendants recognize) is the reason the constituents are relevant. Mr. Lyttle may testify that the AWS study he helped oversee examined the particulars of the manganese compounds in welding fumes, and he may recite the study's conclusions regarding how these particulars affected bioavailability.[3] Mr. Lyttle may also explain the extent, if any, to which he shared the results of the AWS study with his employer or any defendant. But Mr. Lyttle may not testify otherwise regarding bioavailability or his opinions relating thereto. Thus, essentially, the same limitations imposed on Mr. Lyttle in *Jowers* will remain in place.

---

[3] It appears, however there are very few such conclusions; one of the few the Court could find was in the AWS article at 8: "The welding fumes were composed of very fine particles with a log normal size distribution and average diameters in the easily respirable range of 0.1 to 1.0 uM."

The same analysis applies to other witnesses, such as Ms. Quintana and Mr. Ferree. They are both fact witnesses and may not express litigation-generated opinions. If they analyzed the constituency of welding fumes during the relevant time period for purposes of determining the nature of the warnings provided, they may say so.

To be clear: the Court has never ruled that no testimony on the relative bioavailability of manganese contained in welding fumes is permitted from a defense expert or other witness. Rather, the Court has addressed the propriety of specific questions posed to specific witnesses on this topic, and the admissibility of the testimony that defendants seek to elicit. In *Jowers*, for example, there was no expert testimony from any witness indicating that the makeup of the manganese compounds in welding fumes effected bioavailability, or the likelihood that manganese in welding fumes could travel to or cause harm in the brain. Thus, the Court in *Jowers* was concerned with the existence of testimony from Mr. Lyttle regarding the constituency issue for which there was no final link to bioavailability, and thus no relevance. This is why the lines were drawn as they were in *Jowers* in connection with Mr. Lyttle and other witnesses.

In sum, absent opinions presented within expert reports before trial regarding how the chemistry and physics of the manganese compounds contained in welding fumes affect the bioavailability and toxicity of that manganese – and absent an opportunity for opposing parties to challenge those opinions – the Court will not admit such testimony at trial from any witness.

- Defendants' oral motion to admit re-cross testimony contained in the videotape preservation deposition of Dr. Conklin is **denied**.

Defendants assert Dr. Conklin provided new opinion testimony during redirect examination, and so seek permission to present his testimony taken on re-cross. The Court has read the entire deposition

13

and concludes that the allegedly "new" opinion raised at the end of the re-direct of Dr. Conklin is not truly new at all, and thus neither the subsequent re-cross nor re-re-direct is necessary for a full understanding of all the testimony that precedes it. Rather, this "new opinion" simply reaffirms what Dr. Conklin repeats over and over before then – he does not disagree with any parkinsonism diagnosis *because* he has deferred to Mr. Byers' treating neurologists. There is no new "endorsement," by Dr. Conklin, just a deferral.

**IT IS SO ORDERED.**

/s/ Kathleen M. O'Malley
**KATHLEEN McDONALD O'MALLEY
UNITED STATES DISTRICT JUDGE**

**DATED**: November 6, 2008