04cv17033d-Ord(SJMotions).wpd

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

EDDIE & JOYCE BYERS,                    :        Case No.  1:04-CV-17033
                                        :
            Plaintiffs,                 :
                                        :
    v.                                  :
                                        :
LINCOLN ELECTRIC CO., et al.,           :
                                        :        Judge Kathleen M.  O'Malley
            Defendants                  :
                                        :
                                        :        <u>MEMORANDUM & ORDER</u>
                                        :

        This case is one of the approximately 2,600 pending cases that are a part of the Multi-District

Litigation known as *In re Welding Fume Products Liability Litigation*, MDL No. 1535.  As with all of the

*Welding Fume* cases, the plaintiff in this case, Eddie Byers, is a welder who claims: (1) he inhaled fumes

given off by welding rods; (2) these fumes contained manganese; (3) this manganese caused him

permanent neurological injury and other harm; and (4) the defendants knew or should have known that

the use of welding rods would cause these damages.  The gravamen of Byers' second amended complaint

is that the defendants failed to warn him of the health hazards posed by inhaling welding rod fumes

containing manganese and, in fact, conspired to affirmatively conceal these hazards from those engaged

in the welding process.  Byers named 10 manufacturing defendants in his second amended complaint, but

voluntarily dismissed one of them before trial.[1]

Byers' lawsuit went to trial before a jury beginning on November 3, 2008, and the jury returned a verdict in favor of defendants on November 26, 2008.  Shortly before trial began, the Court ruled on a number of summary judgment motions filed by defendants.[2]  Among other topics, these summary judgment motions raised the following issues: (1) the choice of law applicable to the plaintiff's claims; and (2) whether, based on the evidence adduced by the plaintiff regarding specific causation, some or all of the defendants were entitled to judgment as a matter of law.  Because these same issues are certain to recur in other *Welding Fume* MDL cases, the Court promised at trial to issue a written opinion explaining in more thorough fashion the reasoning behind its oral rulings.  This is the promised opinion.

## I.    Facts.

Plaintiff Eddie Byers, who is 48 years old, was raised in Texas.  Byers' father was a welder and taught Byers to weld when he was a young boy.  As Byers grew older, he helped his father on welding jobs during the summer, and Byers eventually became a welder himself in 1978, when he was 17 years old.  Byers worked as a welder for various employers while living in Texas until 1997.  He then moved to Alabama and continued to work as a welder until 2003.  Byers then quit welding because he could no longer perform the physical requirements, due to hand tremor and other symptoms of what his doctor diagnosed as a neurological disease known as Manganese-Induced Parkinsonism.

During the time he lived in Texas, almost all of Byers' welding jobs were also in Texas, although

---

[1]  Byers voluntarily dismissed his claims against manufacturer Deloro Stellite Company before trial.  *See* docket no. 175.  The other nine defendants named in Byers' second amended complaint are listed in the chart below.

[2]  *See* trial tr. at 41-44 (Oct. 22, 2008) (oral rulings on summary judgment motions); Order (Oct. 27, 2008) (minute order documenting oral rulings).

he also had occasional welding jobs out of state, such as in Mississippi, Louisiana, Arkansas, Utah, and California.  Similarly, during the time he lived in Alabama, most of Byers' welding jobs were in Alabama, although he also worked welding jobs in other states, ranging from Florida to Minnesota.  Discovery produced by Byers lists over 100 different job sites in 15 different states.[3]

During his lifetime, Byers used welding consumables produced by a variety of manufacturers.  It is unsurprising that Byers does not have a precise recollection of which manufacturers' welding rods he used at each job location, given the length of his career, the number of his job sites, and the number of different welding rod products he used.  Nonetheless, the chart below fairly summarizes his use of different manufacturers' welding consumables in the two states where he lived – Texas and Alabama.

---

[3]  The different states include AL, AR, CA, FL, LA, IL, IN, MN, MO, MS, PA, TN, TX, UT, & WI.

| Welding Rod Manufacturer | Byers' Use of Manufacturer's Welding Rod Products |
|---|---|
| Lincoln Electric Co. | Regular and consistent use in both TX and AL. |
| Hobart Brothers Company | Regular and consistent use in both TX and AL. |
| ESAB Group | Regular and consistent use in both TX and AL. |
| BOC Group | Used in TX during one job in 1981, and also possibly as a child. BOC stopped manufacturing welding rods in 1986, so he could not have used their products in AL. |
| TDY Industries | Possibly used their products but recalls no details regarding when or where.  TDY stopped manufacturing welding rods in 1992, so he could not have used their products in AL, except possibly during a short job in 1991. |
| Union Carbide Corporation ("UCC") | Used their products but recalls no details regarding when or where. UCC stopped manufacturing welding rods in 1985, so he could not have used their products in AL. |
| Eutectic Corporation | Used in TX as a child. |
| Sandvik, Inc. | Used their stainless steel TIG products during various jobs between 1981-97 while living and working primarily in TX. |
| Westinghouse Electric Corp. ("WEC") | Used in TX as a child.  WEC stopped manufacturing welding rods in 1983, so he could not have used their products in AL. |

The evidence was undisputed that the first three manufacturers listed above (Lincoln, Hobart, and ESAB)

supplied the overwhelming majority of the welding rod products that Byers used during his career.[4]  As

to the last six manufacturers, it is undisputed that Byers either did not use their welding rod products in

Alabama, or at least has no evidence he ever used their welding rod products anywhere besides Texas.

---

[4] At trial, for example, Byers testified that he used products supplied by these three manufacturers for 90-95% of the welding he performed during his career; and that, as between the three, his use could be broken down roughly as follows: Lincoln 40%, Hobart 35%, and ESAB 25%.  Trial. tr. at 738-44, 883 (Nov. 6, 2008).

4

## II.    **Choice of Law**.

Conceivably, the laws of Texas (where Byers did most of his welding), Alabama (where Byers welded and now lives), or Ohio (where Byers filed his lawsuit, where this MDL Court is located, and where two of the largest defendants are headquartered) might apply to Byers' claims.  It is clear, however, that the applicable laws of these states are in actual conflict.  For example, Ohio and Texas recognize comparative negligence and do not bar recovery where the plaintiff's fault is no greater than the combined fault of all defendants; in contrast, Alabama follows the doctrine of contributory negligence, so that a plaintiff's own negligence is a complete defense.[5]  Also, each of the three states has a different statutory cap on punitive damages.[6]  Accordingly, before addressing defendants' summary judgment motions, the Court must determine which state's law applies.

Because Byers filed his complaint directly in this Court (as opposed to having it transferred to this Court pursuant to 28 U.S.C. §1407), the choice-of-law principles of Ohio, the forum state, govern the

---

[5]  *See* Ohio Rev. Code §2315.33 ("[t]he contributory fault of a person does not bar the . . . plaintiff from recovering damages that have directly and proximately resulted from the tortious conduct of one or more other persons, if the contributory fault of the plaintiff was not greater than the combined tortious conduct of all other persons"); Tex. Civ. Prac. & Rem. Code §33.001 ("a claimant may not recover damages if his percentage of responsibility is greater than 50 percent"); *General Motors Corp. v. Saint*, 646 So.2d 564, 568 (Ala. 1994) (Alabama "recogniz[es] the plaintiff's negligence as a complete bar to recovery for injury caused by the defective product") (Hornsby, J., dissenting).

[6]  *See* Ohio Rev. Code. §2315.21(D)(2)(a) (punitive damages capped at two times compensatory damages); Tex. Civ. Prac. & Rem. Code §41.008(b) (punitive damages capped at the greater of: (a) $200,0000; or (b) two times economic damages, plus an amount equal to non-economic damages up to $750,000); Ala. Code §6-11-21(c) (punitive damages capped at three times compensatory damages or $1.5 million, whichever is greater).

Court's analysis.[7]  The Ohio Supreme Court has adopted the choice-of-law approach set out by the *Restatement (Second) of the Law of Conflicts*.[8]  Section 146 of the *Restatement* states: "In an action for a personal injury, the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless, with respect to a particular issue, some other state has a more significant relationship . . . to the occurrence and the parties, in which event the local law of the other state will be applied."[9]  In determining which state has the most "significant relationship" to a plaintiff's tort claim, Ohio courts examine the following factors: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered."[10]  These factors "are to be evaluated according to their relative importance with respect to the particular issue."[11]

Defendants argue that "Texas has a far greater interest in having its product liability laws apply to the underlying action than does either Ohio or Alabama (or any of the other states where Mr. Byers did

---

[7]  *See CenTra, Inc. v. Estrin*, 538 F.3d 402, 409 (6th Cir. 2008) ("[i]n diversity cases we apply the choice-of-law rules and substantive law of the forum state"); *In re Vioxx Prods. Liab. Litig.*, 478 F. Supp. 2d 897, 904 (E.D. La. 2007) (the filing of a case directly in the MDL court in Louisiana "suggests that the Court should apply the law of the state in which it sits, including Louisiana's choice-of-law rules"); *In re Welding Fume Prods. Liab. Litig.*, 245 F.R.D. 279, 295 n.90 (N.D. Ohio 2007) ("In MDL cases, the forum state is typically the state in which the action was initially filed before being transferred to the MDL court.") (citing *In re Vioxx Prods. Liab. Litig.*, 239 F.R.D. 450, 454 (E.D. La. 2006) and *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)).

[8]  *Morgan v. Biro Mfg. Co.*, 474 N.E.2d 286, 289 (Ohio 1984).

[9]  *Id.* at 289 n.4 (quoting *Restatement of the Law (Second), Conflict of Laws* §146 (1971)).

[10]  *Id.* at 289 n.5 (quoting *Restatement of the Law (Second), Conflict of Laws* §145 (1971)).

[11]  *Id.*

small amounts of welding)."[12]  Defendants add that, even if Ohio or Alabama law might apply to *some* of

Byers' claims, "Texas law **unquestionably** applies to plaintiffs' claims against BOC, Union Carbide,

Westinghouse, TDY, Sandvik, and Eutectic because Mr. Byers used these defendants' products (if at all)

**only** while he was living and working primarily in Texas."[13]  Byers responds that "Ohio has a far more

significant relationship to the occurrence [and] the parties than any other state," and further asserts that

Ohio law applies to *all* of Byers' claims against all defendants.[14]

To settle this dispute, the Court first examines the question of whether, as Byers asserts, it must

apply the law of a *single* state to all of his claims against all defendants.  The answer to this question is

best derived with a hypothetical scenario.  Imagine that: (1) Welder used only Defendant A's product for

10 years while living in Ohio, and Defendant A is headquartered in Ohio; (2) Welder moved to Michigan,

used only Defendant B's product for 10 years while living in Michigan, and Defendant B is headquartered

in Michigan; and (3) Welder then retired to Florida, and brought suit in Florida for injuries caused by

welding fume exposure.  Given that Welder suffered no exposure to Defendant A's products anywhere

except Ohio, there is virtually no basis for applying anything but Ohio law to Welder's claims against

Defendant A.  This is true even though Welder alleges he suffered a single, indivisible injury caused by

both Defendants' products.  Similarly, given that Welder suffered no exposure to Defendant B's products

anywhere except Michigan, there is no basis for applying anything but Michigan law to Welder's claims

against Defendant B.  While it might be easier or more convenient for the Florida court to apply, say, only

---

[12]  Motion at 6 (dkt. no. 183).

[13]  *Id.* (emphasis in original).

[14]  Response at 5 (dkt. no. 248); *id.* at 20 ("there is no precedent regarding Defendants' proposal to apply the laws of different states to different defendants" and "the most significant contacts of each Defendant are with Ohio in this case").

Ohio law to all of Welder's claims, there is no nexus between Ohio and Defendant B that would allow this to occur.   Indeed, to apply Ohio law to Welder's claims against Defendant B would likely be unconstitutional.[15]  Thus, in the present case, even if choice-of-law principles suggest that the law of (say) Ohio should apply to Byers' claims against a majority of defendants, this Court cannot apply Ohio law to a particular defendant if there is no significant relationship at all between that defendant and Ohio.[16]

Fortunately, it will be the unusual *Welding Fume* case that has facts similar to the hypothetical

---

[15]  *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821-22 (1985) (holding that "application of Kansas law to every claim in this case is sufficiently arbitrary and unfair as to exceed constitutional limits," because Kansas did not have a "significant contact or significant aggregation of contacts" to some of plaintiffs' claims); *id.* at 816 (noting there are "constitutional limitations on choice of law mandated by the Due Process Clause of the Fourteenth Amendment and the Full Faith and Credit Clause of Article IV, §1").

In addition to *Shutts*, defendants cite a number of other cases for the proposition that "the law of different states may be applied to different defendants" in one action.  *ABB Daimler-Benz Transp. (N. Am.), Inc. v. Amtrak*, 14 F.Supp.2d 75, 88 (D.D.C. 1998); *see also Lombard v. Economic Devlpmt. Admin. of Puerto Rico*, 1995 WL 447651 at *4 (S.D.N.Y. July 27, 1995) ("[u]nder both California and New York conflicts rules, a different determination properly is made for each defendant and each claim"); *Jaurequi v. John Deere Co.*, 986 F.2d 170, 173 (7th Cir. 1993) (district court erred in failing to conduct "a separate conflicts analysis for each defendant's conduct" in a product liability action); *Boxer v. Gottlieb*, 652 F. Supp. 1056, 1062 (S.D.N.Y. 1987) ("[t]he issue of which law governs liability must be determined separately for each defendant, since the competing interests involved may differ"); *Kelly v. Johns-Manville Corp.*, 590 F. Supp. 1089, 1095 (E.D. Pa. 1984) (in a "multi-defendant asbestos case, the plaintiff's separate claims are to be treated as discrete causes of action" with regard to choice of law); *Keene Corp. v. Insurance Co. of North America*, 597 F.Supp. 934, 941 (D.D.C. 1984) ("Courts have long recognized that they are not bound to decide all issues under the local law of a single State.  Each issue must receive separate consideration because of the varying interests involved.") (citing *Restatement of the Law (Second), Conflict of Laws* §145(1) comment d (1971)).  While each of these cases may be distinguished from this case, there is certainly more authority supporting defendants' position than Byers' position on this point.

[16]  The application of different states' laws to separate issues in the same case is known as "dépeçage."  *See Hoover v. Recreation Eqpt. Corp.*, 792 F.Supp. 1484, 1490-91 (N.D. Ohio 1991) (deciding whether to employ "the conflicts doctrine of dépeçage"); *Mayse v. Watson*, 1985 WL 7613 at *2 (Ohio Ct. App. Sept. 27, 1985) (suggesting that Ohio courts would recognize dépeçage); *cf. Simon v. United States*, 805 N.E.2d 798, 801-02 (Ind. 2004) (recognizing that, while Indiana courts will make separate choice-of-law determinations for different *counts* and different *defendants*, Indiana "does not allow issues within those counts to be analyzed separately" pursuant to the doctrine of dépeçage).

scenario described above.  In this case, for example, although Byers did not use welding rods manufactured by six of the nine defendants listed in the chart above while he was living in Alabama, he did use welding rods manufactured by *all nine* of the defendants while living in Texas.  Further, he spent about 20 years of his working life living in Texas, as compared to spending only about 5 years of his working life living in Alabama.  As explained below, Byers' use of all of the defendants' products in Texas for a majority of his welding career makes the Court's choice-of-law analysis relatively simple.

As noted, neither Byers nor defendants argue that Alabama law applies to any of Byers' claims.[17] Rather, defendants argue that Texas law applies, while Byers argues that Ohio law applies.  An examination of the relevant factors reveals that defendants' position is correct.

### A.    The Place Where the Injury Occurred.

This factor is the most important; under Ohio choice-of-law principles, in a tort action for personal injury, there is a rebuttable presumption that the law of the state where the injury occurred will apply to determine liability.[18]  Unlike in many tort actions, where a single, brief, localized event (such as a car accident) causes the alleged injury, Byers claims he suffered personal injury after repeated exposure to welding fumes over a long period of time and in over a dozen different States.  Byers argues that, because the "place where his injury occurred" is not limited in time or place, and because he suffered a single, indivisible injury incurred throughout his nomadic career, this factor is inapplicable.  The Court does not

---

[17] Defendants do argue *in the alternative* that Alabama law might apply to some of Byers' claims against certain defendants, but only if the Court concludes that Texas law does not apply.  *See* reply brief (dkt no. 276) at 11 *et seq.*

[18] *Ritt v. Billy Blanks Enterps.*, 870 N.E.2d 212, 227 (Ohio Ct. App. 2007) ("When confronted with a choice-of-law issue in a tort action . . . a presumption is created that the law of the place of the injury controls unless another jurisdiction has a more significant relationship to the lawsuit.").

agree.

To support his position, Byers cites a comment in the *Restatement*, which reads as follows:

*In the case of personal injuries* . . . , the place where the injury occurred is a contact that, as to most issues, plays an important role in the selection of the state of the applicable law. This contact likewise plays an important role in the selection of the state of the applicable law *in the case of other kinds of torts*, provided that the injury occurred in a single, clearly ascertainable, state.  * * * [19]

The *Restatement* explains that an example of one of these latter "other kinds of torts" that does not involve personal injuries and does not occur in a single state is "the case of multistate defamation."[20]

Byers asserts that this comment in the *Restatement* means "the place of injury is important only when the injury occurred in a single state," and the place of injury factor is therefore "inapplicable" in his case.[21]  But the *Restatement* is not saying that the place of injury matters only if the injury occurred in a single state; it is saying that: (a) in tort cases involving *personal* injuries, the place of injury is *always* important; and (b) in other types of tort cases, the place of injury is important if it occurred in a single state, but is less important if it occurred in several states.  Because Byers advances a tort claim for personal injuries, the place(s) he suffered injury remain of primary import in a choice of law analysis.

The premise underlying Byers' claims is that, when he inhaled the fumes given off by defendants' welding rods, the manganese contained in those fumes damaged the parts of his brain that control voluntary movement.  Byers was exposed to these welding fumes in 15 different states, so all of these states may be construed as his "place of injury."  But his exposure to welding fumes in most of these states was short-lived.  For example, Byers spent one month of his entire career welding in Wisconsin.  In

_____

[19]  *Restatement of the Law (Second), Conflict of Laws* §145(2), comment e (1971) (citations omitted, emphasis added).

[20]  *Id.*

[21]  Response brief (dkt no. 248) at 6.

contrast, Byers spent 20 years living and working in Texas, and the vast majority of his welding jobs during that time were also in Texas.  Further, Byers recalled the "smokiest jobsites" he worked were in Texas.  Based on the undisputed facts in this case, it is safe to say that, while there may have been several "places of injury," the most substantial locus of the personal injury that Byers allegedly suffered is Texas.  Thus, there is a rebuttable presumption that Texas law applies in Byers' case.

Attempting to counter this presumption, Byers cites *In re Bendectin Litigation*,[22] an MDL case brought by children with birth defects who alleged their mothers' use of the morning sickness drug Bendectin caused their conditions.  In *Bendectin*, the district court judge ordered a trifurcated common-issues trial, with the first phase addressing "the question [of] whether . . . ingestion of Bendectin proximately causes birth defects."[23]  Given that the plaintiffs had filed cases all over the country, however, the trial judge ruled that the common issues trial would include only cases "originally brought or removed to federal court in Ohio," because these cases "would necessarily be governed by Ohio law."[24]  Since the defendant was headquartered in Ohio, many plaintiffs had filed suit in Ohio courts.  The judge also ruled "that plaintiffs who had originally filed in other districts and who voluntarily chose to participate in the common-issues trial would consent to application of the law of Ohio by so agreeing to participate."[25]  The common-issues trial went forward with over 800 plaintiffs, and the jury concluded that plaintiffs did not prove that "ingestion of Bendectin at therapeutic doses during the period of fetal organogenesis is a

---

[22]  857 F.2d 290 (6th Cir. 1988) (applying Ohio law).

[23]  *Id.* at 296.

[24]  *Id.* at 295.

[25]  *Id.*

11

proximate cause of human birth defects."[26]

On appeal, the plaintiffs argued, among other things, that the district court's choice-of-law analysis was faulty. The plaintiffs conceded that, because they had all initially filed their lawsuits in Ohio (or had agreed to application of Ohio law), it was clear that Ohio *choice-of-law* principles applied. But plaintiffs argued this did not mean Ohio *substantive* law should apply to their claims; rather, the applicable law in each case should be the law of the states where they lived ("states of domicile"), or the states where their mothers had ingested the drug. The *Bendectin* court disagreed, for two reasons: (1) first, and most important, "the plaintiffs themselves urged the district judge to apply the law of Ohio to th[e] case, and never argued that any other law should apply;"[27] and (2) second, "it was often unknown in what state the plaintiffs' mothers had ingested the drug."[28] Of course, neither of these factors adhere in Byers' case: the parties hotly contest which state's law is applicable, and the parties know where Byers was exposed to welding fumes. Thus, Byers' citation of *Bendectin* is unpersuasive.[29]

To be fair, Byers is correct that the Sixth Circuit Court of Appeals, in *Bendectin,* gave overriding weight to the factor of where the product at issue was manufactured. The court viewed "the law of the

---

[26] *Id.* at 294.

[27] *Id.* at 303; *see id.* (further noting that "[t]hose plaintiffs who transferred into the common issues trial had the unfettered discretion to accept the Ohio forum and the district court's previously announced decision to apply Ohio law, or to return their cases to the district in which they were originally filed").

[28] *Bowling v. Pfizer, Inc.*, 143 F.R.D. 141, 163 (S.D. Ohio 1992) (declining to follow the *Bendectin* choice-of-law analysis); *Bendectin*, 857 F.2d at 305.

[29] It is also notable that plaintiff's invocation of *Bendectin* to support application of Ohio substantive law is contrary to arguments made by plaintiffs in earlier *Welding Fume* cases. *See In re Welding Fume Prods. Liab. Litig.*, 2006 WL 2869548 (N.D. Ohio Oct. 5, 2006) (in a multi-plaintiff trial, with plaintiffs living in different states, "[p]laintiffs originally argued that the law of South Carolina should apply to all five of the Duke Power plaintiffs, because South Carolina is the state where the most egregious welding fume exposures occurred").

state of manufacture of the product as being more significant in this type of case than that of the state where an individual plaintiff happens to live."[30]   This was because the defendant "manufactured and distributed a uniform drug internationally.  The company issued a uniform set of warnings and instructions for use.  The regulations governing the labeling, research, and distribution of the drug were governed either by Ohio law or by the federal Food, Drug and Cosmetic Act.  Standards against which defendant's wrongful or negligent conduct may be measured are also set by Ohio and federal law."[31]   Byers argues the same observations apply to at least some of the defendants in his case – such as Lincoln and Hobart, both of which are headquartered in Ohio.

That the *Bendectin* court found the place of product manufacture decisive in its choice-of-law analysis, however, does not persuade this Court that the same result should apply in this case.  First, as noted above, the *Bendectin* court's deliberation gave no weight to the rebuttable presumption as required under Ohio law, because the place of plaintiff's injury was "often unknown."  The facts in this case are different – Byers knows where he was exposed to defendants' products, so the rebuttable presumption applies.  Second, it is notable that no other court in this Circuit has ever followed the *Bendectin* choice-of-law analysis in a products liability action.  Indeed, in another MDL proceeding, the Sixth Circuit Court

---

[30]  *Bendectin*, 857 F.2d at 305.

[31]  *Id*.   The court also stated: "The State of Ohio is responsible for regulating local aspects of the marketing, manufacture, distribution, and labeling of the drug, and thus the relationship between the parties is essentially centered in Ohio, where the tortious conduct and the safety of the product are regulated. The fact that federal regulation through the FDCA impacts pervasively upon the development and approval of the drug in question tends further to minimize the significance of the law of other states and to focus emphasis upon the state of manufacture as the state in which application of the federal standards and oversight is most likely to occur."  *Id.*

of Appeals later *rejected* the conclusion that the law of the state of product manufacture should apply.[32]

Byers also cites *Solly v. Manville Corp. Asbestos Disease Fund*[33] in support of the proposition that, because his exposure to welding fumes occurred in many states, the Court cannot "pick" a single state as the place where his injury occurred for purposes of weighing the first factor in a choice-of-law analysis. In *Solly*, the plaintiff brought a product liability action against several asbestos manufacturers; his "exposure to asbestos occurred throughout the United States (e.g., Florida, Alabama, New York, Ohio, Kentucky and Indiana)."[34]  The plaintiff argued that Ohio law should apply because "it is impossible to determine any single place of injury in this case given the fact that his injuries developed over a period of time," and because the other choice-of-law factors weighed in favor of Ohio.  The defendants countered that New York law should apply, because that is where Solly lived and spent most of his career, and also because the evidence showed his "alleged exposure to asbestos in Ohio was less in duration and intensity than his alleged exposure in New York."[35]

The district court sided with the plaintiff and applied Ohio law, and the Sixth Circuit Court of

---

[32]  *In re American Medical Systems*, 75 F.3d 1069 (6th Cir. 1996) (reversing certification of a nationwide medical device defect case because, among other reasons, the trial court failed to consider that the putative class members' claims would be governed by the laws of their home states – not the state of product manufacture – which would vary substantially).  *See also In re Telectronics Pacing Sys., Inc.*, 172 F.R.D. 271, 291 n.13 (S.D. Ohio 1997) (declining to apply the law of the state of product manufacture, and stating of the *Bendectin* analysis: '[this court] question[s] the correctness of that ruling and further question[s] the continuing validity of that holding in light of the Sixth Circuit's later ruling in *In re American Medical Systems*"); *Bowling v. Pfizer, Inc.*, 143 F.R.D. 141, 163 (S.D. Ohio 1992) (concluding the *Bendectin* ruling was limited to its facts); *Jones v. Brush Wellman, Inc.*, 2000 WL 33727733 at *5 (N.D. Ohio Sept. 13, 2000) (concluding the *Bendectin* analysis did not apply because plaintiffs knew where they were exposed to the defendants' products).

[33]  1992 WL 125386 (6th Cir. June 8, 1992), *cert. denied*, 506 U.S. 954 (1992).

[34]  *Id.* at *3.

[35]  *Id.* at *2.

Appeals affirmed.  The appellate court stated that "an inquiry into the place of injury is inappropriate since Solly's injury occurred in various places, including Ohio."[36]  Examining factors other than the place of injury, the *Solly* court observed that: "1. Four of the defendants in Solly's action had their principal place of business in Ohio; 2. Solly was exposed to asbestos in Ohio, and his last injurious exposure to asbestos was in Ohio . . . ; [and] 3. Solly filed for and received Ohio workers' compensation benefits for a tumor allegedly caused by his exposure to asbestos."[37]  The court concluded that these factors combined to preponderate in favor of applying Ohio law.

At first glance, *Solly* does support Byers' argument – the *Solly* court states explicitly that "an inquiry into the place of injury is inappropriate," because the plaintiff's injury occurred in several states.  But the *Solly* court then went on to give "place of injury" some weight after all, noting that the plaintiff was "exposed to asbestos in Ohio, and his last injurious exposure to asbestos was in Ohio."  Had Solly had no exposure at all to asbestos in Ohio, it appears doubtful the court's analysis would have been the same.  Further, it is clear that, under Ohio choice-of-law principles, the first factor – place of injury – is normally the most important factor; this Court is unwilling to simply ignore it altogether merely because the injury did not occur in a single state.  And finally, the other factors considered by the *Solly* court all pointed to the same state – Ohio.  In this case, the other factors point to a variety of states, including Texas.  For

---

[36]  *Id.* at *3.

[37]  *Id.*  Under Ohio law, in a choice-of-law analysis, courts also examine where the plaintiff in a tortious injury case applied for worker's compensation benefits.  *See, e.g., Morgan v. Biro*, 474 N.E.2d 286, 289 (Ohio 1984) (concluding that "the state of Kentucky has the most significant relationship to the parties and events" in the case because, among other reasons, the plaintiff "received workers' compensation benefits under Kentucky law").  In this case, Byers received worker's compensation benefits from Texas in connection with welding fume exposure, although the injury for which he was compensated was respiratory, not neurological.  To the extent this factor enters the weighing process, then, Byers' receipt of worker's compensation benefits from Texas supports the conclusion that Texas law applies to his claims.

example, Byers applied for worker's compensation benefits in Texas and for social security disability benefits in Alabama; his last exposure to welding fumes was in Alabama; the state with the most defendants' places of incorporation is Delaware; and defendants' headquarters are in seven different states (including two each in Ohio and New Jersey).  While the factors the *Solly* court weighed yielded a clear answer on the facts of that case, weighing only these same factors in this case does not.  Here, no clear answer to the choice-of-law analysis appears without reference to the principal fact of where Byers was exposed to defendants' products.

In sum, the first factor in the Court's choice-of-law analysis – "the place where the injury occurred" – cannot be ignored, and it points strongly to Texas as being the state providing the substantive law applicable to Byers' claims.

### B.    The Place Where the Conduct Causing the Injury Occurred.

Byers asserts the conduct that caused his alleged injuries in this case occurred in Ohio, "where Defendants manufactured most of the products he used and where they made the joint decisions regarding when and how to warn of risks associated with the use of their products."[38]  As an initial matter, while it may be true that (for example) defendant Lincoln Electric, which is headquartered in Ohio, made these decisions in Ohio, there is no apparent basis upon which to assert that other defendants, such as Union Carbide (a New York corporation headquartered in Texas) or BOC (a Delaware corporation headquartered in New Jersey) or TDY (a California corporation headquartered in Pennsylvania) also made these decisions in Ohio.

Furthermore, regardless of where the defendants made their warning-related decisions, the "place

---

[38]  Response brief (dkt. no. 248) at 10.

where the conduct causing the injury occurred" is not determined by where the defendant manufactured its product or where it made its decisions on whether and how to warn.  Rather, under Ohio law, "a failure to warn occurs at the place where the plaintiffs could reasonably have been warned regardless of where the decision not to warn took place."[39]  In other words, a defendant's alleged conduct of failure to warn occurred where the plaintiff used the product with the allegedly defective warning.  Thus, in *Jones v. Brush Wellman*, where the plaintiffs "encountered and were exposed to defendant's products in Tennessee," the "failure to warn which might have proximately caused plaintiffs' injuries [also] occurred in Tennessee."[40]

In essence, then, in a product liability case for failure to warn, the first factor and second factor in a choice-of-law analysis are equivalent.  Because Byers used defendants' products primarily in Texas, the defendants' failure to warn also occurred primarily in Texas.

### C.    The Domicile, Residence, Nationality, Place of Incorporation, and Place of Business of the Parties.

As suggested earlier, it suffices to say that this factor does not preponderate in favor of any one state.  The nine defendants listed in the chart above are incorporated in a variety of states: Ohio (two), Delaware (four), New York (two), and California (one).  The defendants' principal places of business are even more varied, and do not overlap with Byers' current state of residence, Alabama (although defendant Union Carbide is headquartered in Texas).  The *Restatement* observes: "The fact that the domicil and place of business of all parties are grouped *in a single state* is an important factor to be considered in

---

[39] *Jones v. Brush Wellman, Inc.*, 2000 WL 33727733 at *4 (N.D. Ohio Sept. 13, 2000).

[40] *Id.  But see LaPlante v. American Honda Motor Co., Inc.*, 27 F.3d 731, 741 (1st Cir. 1994) ("the tortious conduct allegedly giving rise to plaintiff's injuries occurred in Japan, where the subject ATV was designed and its warnings devised"); *Bendectin*, 857 F.2d at 305 (discussed in text above).

17

determining the state of the applicable law."[41]  Because there is nothing near such a grouping in this case, the third factor plays no role in the Court's choice-of-law analysis.

### D.      The Place Where the Relationship, If Any, Between the Parties Is Centered.

The fourth factor in a choice-of-law analysis is usually not relevant in a products liability action. As one case notes, "the language of §145 [of the *Restatement*] makes allowance for the possibility that there will be *no* relationship between the parties by its use of the phrase 'if any.'"[42]  Thus, courts in products liability cases often conclude that, "there being no 'relationship' between the parties in the ordinary sense of the word, this factor is unhelpful in making a choice-of-law determination."[43]

This Court agrees that, because there was never any real, personal, ongoing relationship between Byers and any of the defendants in this case, the fourth factor also plays no role in the Court's choice-of-law analysis.

### E.      Conclusion.

The first and most important factor in the Court's choice-of-law analysis is the place where Byers suffered his alleged personal injuries.  Byers' own theory of liability is that he suffered brain damage caused by his exposure to welding fumes.  Thus, the place where his injury occurred is the place where

---

[41]  *Restatement of the Law (Second), Conflict of Laws* §145(2), comment e (1971) (emphasis added).

[42]  *Allison v. ITE Imperial Corp.*, 928 F.2d 137, 142 n.5 (5th Cir. 1991) (emphasis added).

[43]  *LaPlante v. American Honda Motor Co., Inc.*, 27 F.3d 731, 741-42 (1st Cir. 1994); *see also Allison*, 928 F.2d at 142 n.5 (affirming the district court's analysis, but noting that, "[u]nless the product the defendant comes in contact with is mobile in its use, or the plaintiff has a history of contacts with the defendant's products before the injury, the center of the relationship under the district court's analysis will always be identical to the place of injury").

this welding fume exposure occurred; and this location is a function of where his welding jobs were and also which jobs produced the most copious fumes.  In Byers' case, the place of his most substantial exposure, as measured by both where he spent the most time welding and also where his "smokiest" jobs were, was Texas.  Far more than any other state, this is the place where Byers suffered his alleged personal injury.

Under Ohio law, then, there is a rebuttable presumption that Texas law applies in this case.  This presumption may be rebutted if the other factors combine to show that some other state has a more significant relationship to the occurrence and the parties.  The other factors in this case, however, either carry no weight, or also weigh in favor of Texas.  Accordingly, the applicable law in this case is the state law of Texas.

Notably, this result adheres to the broader principles underlying any choice-of-law analysis.  According to the *Restatement*, "factors relevant to the choice of the applicable rule of law include: (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of law to be applied."[44]  Some of these factors, such as the needs of interstate and international systems, are neutral in this case.[45]  Other factors, such as the relevant policies of each forum, weigh in favor of Texas.  Specifically, Byers was allegedly injured in Texas by welding rod products manufactured

---

[44] *Morgan v. Biro Mfg. Co., Inc.*, 474 N.E.2d at 289 n.6 (quoting *Restatement of the Law (Second), Conflict of Laws* §6 (1971)).

[45] *See Lange v. Penn Mut. Life Ins. Co.*, 843 F.2d 1175, 1180-81 (9th Cir. 1988) (assessing these *Restatement* §6 factors and concluding that several were neutral and did not weigh in favor of the application of any of the three states' law at issue).

in, among other places, Ohio.  It is certainly the policy of Texas (and the entire field of tort law) to compensate its citizens and residents for injuries inflicted upon them through others' tortious conduct.[46] This compares with Ohio's "policy objective in deterring the manufacture and sale of defective products."[47]  In choosing between these two policies, the Ohio Supreme Court has suggested the former carries more weight.[48]  And given that many of the welding rods used by Byers were not manufactured in Ohio, Ohio's policies must be given even less weight when choosing between Texas and Ohio law.

Another important factor is ease in the determination of the law to be applied.  This factor takes on special significance in the context of this MDL; given that many welder-plaintiffs, like Byers, have itinerant careers, choice-of-law issues will arise frequently in *Welding Fume* cases.  In most cases, however, there will be a state where the plaintiff performed a more substantial amount (if not an outright majority) of his welding, as compared with anywhere else.  Using the analysis set out above, and absent unusual circumstances, the law applicable to that welder's case will be relatively easily determined – it will be the law of the state where he performed most of his work and was thus most exposed to welding fumes.  This method of determination will usually be easier than assessing whether the law of Ohio may

---

[46]  *See id.* at 1181 ("The basic policies underlying the field of tort law are to provide compensation for the injured tort victim and to deter wrongful intentional conduct through the imposition of punitive damages") (citing *Prosser & Keeton on Torts*, §2 (5th ed. 1984)).

[47]  *Morgan*, 474 N.E.2d at 289.

[48]  *Id.* (holding that, even though "[the defendant] was incorporated under the laws of [Ohio]" and "the product was manufactured in Ohio," the laws of Kentucky applied because the plaintiff's "injury took place in Kentucky and . . . he was a resident thereof at the time of his accident.  Further, [the plaintiff] was employed . . . in Kentucky and received workers' compensation benefits under Kentucky law.").  *See also id.* at 290-91 (dissenting opinion, which the majority apparently rejected, arguing as follows: "Public policy dictates that a manufacturer which is producing in, and receiving all the benefits and protections of, the state of Ohio should also be held to the standards of care of this state.  The [defendant] in this case produced the product which caused this injury in Ohio and sold it from Ohio.  Therefore, the company should be bound by Ohio law for any design defect in that product.").

fairly be applied, depending on how many non-Ohio defendants are named in that particular case.

There will be some *Welding Fume* cases where other factors important to a choice-of law analysis, which are not present in *Byers*, come into play; there will be some cases where there is no clear answer to the question of where did the plaintiff suffer the most substantial amount of welding fume exposure; there will be some cases where, given the idiosyncracies of the timing and location of the plaintiff's welding jobs, the law of a single state cannot apply to all of the plaintiff's claims; and there will be some cases, originally filed elsewhere and transferred to this MDL Court, where the Court will have to apply different choice-of-law principles altogether.[49] In this case, however, a weighing of all the relevant factors leads to the conclusion that Texas law applies to Byers' claims.  Accordingly, the Court applies Texas law below when analyzing defendants' arguments that they are entitled to summary judgment for lack of proof of specific causation.

### III.  Specific Causation.

In their motion for summary judgment, defendants argue Byers cannot prevail at trial because he has insufficient evidence regarding: "(1) what level of exposure to welding fumes – if any – causes neurological injury; and (2) whether [he] was exposed to fumes from each individual defendant's products

---

[49] As to this last point, "[i]n MDL cases, the forum state is typically the state in which the action was initially filed before being transferred to the MDL court." *In re Welding Fume Prods. Liab. Litig.*, 245 F.R.D. 279, 295 n.90 (N.D. Ohio 2007) (citing *In re Vioxx Prods. Liab. Litig.*, 239 F.R.D. 450, 454 (E.D. La. 2006 and *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)).  Thus, in a case that was transferred to this MDL Court pursuant to 28 U.S.C. §1407, the Court is required to use the choice-of-law analysis of the forum of the transferor court.  Of course, there is a good probability that the forum of the transferor court has, like Ohio, adopted the *Restatement* approach.  Alternatively, if the forum of the transferor court follows the traditional rule of *lex loci delict* – meaning, the law of the place where the tort was committed applies – the Court's analysis will be even easier, as the first *Restatement* factor is decisive.

at that level."[50]  Defendants cite two authoritative Texas cases, known as *Borg-Warner* and *Stephens*,[51] to support their argument.  Before assessing Byers' evidence, the Court examines the holdings from these two cases.

### A.      Texas Law on Specific Causation.

In *Borg-Warner*, the Texas Supreme Court "continue[d] [its] struggle with the appropriate parameters for lawsuits alleging asbestos-related injuries."[52]  Specifically, the court "had the occasion to decide whether [evidence of exposure to] 'some' respirable fibers is sufficient to show that a product containing asbestos was a substantial factor in causing asbestosis."[53]  The court concluded that a plaintiff's showing of exposure only to "some fibers" was insufficient to support a verdict – more precision was required.

The facts of *Borg-Warner* were as follows.[54]  The plaintiff, Arturo Flores, worked as a brake mechanic for about 35 years.  Part of his job involved applying a grinder to new break pads, so they would not squeal when installed.  This grinding process created visible clouds of dust.  Flores worked in a relatively small room and routinely inhaled this dust.  The brake pads that Flores worked on were manufactured by half a dozen companies, one of which was Borg-Warner.  More specifically, the evidence showed that Flores worked with Borg-Warner brake pads during a three-year period early in his career

---

[50]  Motion (dkt no. 183) at 21.

[51]  *Borg-Warner Corp. v. Flores*, 232 S.W.3d 765 (Tex. 2007); *Georgia-Pacific v. Stephens*, 239 S.W.3d 304 (Tex. Ct. App. 2007).

[52]  *Borg-Warner Corp. v. Flores*, 232 S.W.3d at 765.

[53]  *Id.* at 766.

[54]  *See generally id.* at 766-69 (summarizing the evidence and verdict at trial).

(1972-75), and about one quarter to one third of the brake pads Flores worked with during that period were Borg-Warner products.

Some of the brake pads Flores worked on contained asbestos, including the Borg-Warner products, which were comprised of up to 28% asbestos by weight.  At trial, Flores presented an expert toxicologist who engaged in a medico-scientific literature review and testified that: (1) most of the asbestos contained in brake pads is destroyed by the heat of friction, and therefore is not released into the air; but (2) nonetheless, the dust produced during brake pad grinding still contains "some" respirable asbestos fibers. Flores also presented an expert pulmonologist, who testified that: (1) the obstructive lung disease revealed by Flores's pulmonary function tests was unrelated to asbestos exposure; but (2) the interstitial lung disease revealed by Flores's x-rays was asbestosis.  The manufacturing defendants, in contrast, presented an expert pulmonologist who testified that Flores's x-rays did not show he had any asbestos-related disease.  Flores also presented his medical records, including: (1) the opinion of a NIOSH-certified B-reader physician that the changes in Flores's lung tissue were "consistent with asbestosis;" and (2) a report from his cardiologist that Flores had admitted to smoking more than a pack of cigarettes a day since age 25.

The jury concluded that Flores had sustained an asbestos-related injury proximately caused by Borg-Warner and three other defendants, and that Borg-Warner was responsible for 37% of $112,000 in compensatory damages.[55]  Borg-Warner appealed, arguing that, among other things, Flores had not proved liability because he had not adduced sufficient evidence of exposure to injurious levels of asbestos from Borg-Warner products.

The *Borg-Warner* court began its analysis by quoting "the most widely cited standard for proving

---

[55]  *Id.* at 768.  The jury also assessed $55,000 in punitive damages against Borg-Warner.

causation in asbestos cases," known as the "*Lohrmann* 'frequency, regularity, and proximity' test."[56] Under the *Lohrmann* test, "[t]o support a reasonable inference of substantial causation from circumstantial evidence, there must be evidence of [1] exposure to a specific product [2] on a regular basis [3] over some extended period of time [4] in proximity to where the plaintiff actually worked."[57]  The *Lohrmann* test is explicitly more strict than the standard "'that if the plaintiff can present *any* evidence that a company's asbestos-containing product was at the workplace while the plaintiff was at the workplace, a jury question has been established as to whether that product proximately caused the plaintiff's disease."[58]

The *Borg-Warner* court agreed with the *Lohrmann* court "that a 'frequency, regularity, and proximity test' is appropriate."[59]  But the *Borg-Warner* court added that "those terms do not, in themselves, capture the emphasis [that Texas] jurisprudence has placed on causation as an essential predicate to liability."[60]  Rather, under Texas law, there must *also* be evidence allowing the fact-finder to "determine whether the asbestos in the defendant's product was a substantial factor in bringing about the plaintiff's injuries."[61]  And, more specifically, this means the plaintiff must present "quantitative information"

---

[56]  *Id.* at 769 (citing *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156 (4th Cir. 1986).

[57]  *Id.* (quoting *Lohrmann*, 782 F.2d at 1162-63); *see also Lohrmann*, 782 F.2d at 1162 (The rule employed by the district court judge was: "Whether a plaintiff could successfully get to the jury or defeat a motion for summary judgment under such a theory [of exposure to asbestos] would depend upon the frequency of the use of the product and the regularity or extent of the plaintiff's employment in proximity thereto.")

[58]  *Id.* (emphasis added) (quoting *Lohrmann*, 782 F.2d at 1163).

[59]  *Id.*

[60]  *Id.*

[61]  *Id.* at 770.

regarding his "dose."[62]

The *Borg-Warner* court observed that: (1) [a]sbestosis appears to be dose-related, so that the more one is exposed, the more likely the disease is to occur, and the higher the exposure the more severe the disease is likely to be;" (2) "asbestos is 'plentiful' in the ambient air and . . . "everyone" is exposed to it[;] * * * therefore, some exposure 'threshold' must be demonstrated before a claimant can prove his asbestosis was caused by a particular product;" and (3) "[t]here is general agreement from epidemiologic studies that the development of asbestosis requires heavy exposure to asbestos . . . in the range of 25 to 100 fibers per cubic centimeter-year."[63] Given these parameters, the *Borg-Warner* court concluded, simple proof of "some exposure" to asbestos – even proof that the plaintiff worked in close proximity to a specific asbestos product on a fairly regular basis over an extended period of time – was "necessary but not sufficient."[64] This is because evidence regarding "frequency, regularity, and proximity" to a particular defendant's asbestos product, without any evidence of dose, did not prove that the product was a substantial factor in causing asbestosis. The *Borg-Warner* court explained its ruling in the context of Flores's circumstances:

> [The record in this case] reveals nothing about how much asbestos Flores might have inhaled. He performed about fifteen to twenty brake jobs a week for over thirty years, and was therefore exposed to "some asbestos" on a fairly regular basis for an extended period of time. Nevertheless, absent any evidence of dose, the jury could not evaluate the quantity of respirable asbestos to which Flores might have been exposed or whether those amounts were sufficient to cause asbestosis. Nor did Flores introduce evidence regarding what percentage of that indeterminate amount may have originated in Borg-Warner products. * * * Thus, while some respirable fibers may be released upon grinding some brake pads, the sparse record here contains no evidence of the approximate quantum of Borg-Warner fibers to which Flores was exposed, and whether this sufficiently contributed

---

[62] *Id.* at 772.

[63] *Id.* at 771, 773 (internal quotation marks and citations omitted).

[64] *Id.* at 772.

to the aggregate dose of asbestos Flores inhaled, such that it could be considered a substantial factor in causing his asbestosis.

Thus, a literal application of *Lohrmann* leaves questions unanswered in cases like this.  The evidence showed that Flores worked in a small room, grinding brake pads composed partially of embedded asbestos fibers, five to seven times per week over a four year period – seemingly satisfying *Lohrmann's* frequency-regularity-proximity test.  Implicit in that test, however, must be a requirement that asbestos fibers were released in an amount sufficient to cause Flores's asbestosis . . . . In a case like this, proof of mere frequency, regularity, and proximity is necessary but not sufficient, as it provides none of the quantitative information necessary to support causation under Texas law.[65]

Notably, the *Borg-Warner* court added that the Texas law requirement of "quantitative information" regarding dose, "which separates the speculative from the probable, need not be reduced to mathematical precision."[66]  Rather, "[d]efendant-specific evidence relating to the approximate dose to which the plaintiff was exposed, coupled with evidence that the dose was a substantial factor in causing the asbestos-related disease, will suffice."[67]  Put differently, a plaintiff "cannot be expected to . . . trace the unknowable path of a given asbestos fiber," but "there must be reasonable evidence that the exposure was of sufficient magnitude to exceed the threshold before a likelihood of 'causation' can be inferred."[68]

---

[65] *Id.* at 771-72 (citations and footnotes omitted)

[66] *Id.* at 773.

[67] *Id.*

[68] *Id.* at 772-73 (quoting *Rutherford v. Owens-Illinois, Inc.*, 941 P.2d 1203, 1219 (Cal. 1997)).  The *Borg-Warner* court also cited the following language from *Rutherford* with approval: "plaintiffs may prove causation in asbestos-related cancer cases by demonstrating that the plaintiff's exposure to defendant's asbestos-containing product in reasonable medical probability was a substantial factor in contributing to the aggregate *dose* of asbestos the plaintiff or decedent inhaled or ingested, and hence to the *risk* of developing asbestos-related cancer, without the need to demonstrate that fibers from the defendant's particular product were the ones, or among the ones, that *actually* produced the malignant growth."  *Id.* (emphasis in original).  The *Borg-Warner* court also suggested that, in some cases, the plaintiff's exposure to toxic levels of a product may be so clearly established that this quantitative analysis becomes unnecessary, such as when "workers were so covered with asbestos as to be dubbed 'the snowmen of Grand Central.'" *Id.* at 774 (quoting *Temple-Inland Forest Prods. Corp. v. Carter*, 993 S.W.2d 88, 95 (Tex. 1999)) (some internal quotation marks omitted).

Ultimately, then, the Texas Supreme Court held that a plaintiff can "prove that the defendant's product was a substantial factor in causing the alleged harm" only by adducing quantitative evidence of (1) how much asbestos exposure is usually required before harm will result; and (2) how much asbestos exposure the plaintiff actually suffered from the defendant's products.[69]

The *Borg-Warner* opinion was a watershed holding in Texas in the area of asbestos litigation, and more broadly in the area of toxic tort law and specific causation.[70]  Since the opinion's recent issuance, only one Texas appellate court has applied it: *Georgia-Pacific v. Stephens*.[71]  A review of *Stephens* also enlightens this Court's analysis of defendants' summary judgment motions in Byers' case.

In *Stephens*, as in *Borg-Warner*, the plaintiff (Fred Stephens) contracted asbestosis and sued several defendants who were manufacturers of certain asbestos-containing products.  Rather than brake pads, however, the product at issue in *Stephens* was the joint compound used "to connect adjoining pieces

---

[69]  *Id.* at 773.

[70]  Notably, *Borg-Warner* did not necessarily change the analysis or burden of proof in all Texas toxic tort cases.  *See In re Ephedra Prods. Liab. Litig.*, 2007 WL 2947451 at *5-6 (S.D.N.Y. Oct. 9, 2007) (concluding that the issuance of *Borg-Warner* did not mandate a re-analysis of defendants' summary judgment motion under Texas law because, among other things, "Ephedra . . . stands at the opposite end of the spectrum of toxic substances from asbestos. * * * [W]ith ephedra the facts of a case almost always show that one specific product was ingested within the brief relevant time before a sudden injury[,] like stroke."); *Borg-Warner*, 232 S.W.2d at 773 ("proof of causation may differ depending on the product at issue").

[71]  239 S.W.3d 304 (Tex. Ct. App. 2007).  Other Texas appellate courts have mentioned *Borg-Warner*, but only in passing.  One of these, *In re Allied Chemical Corp.*, — S.W.3d —, 2009 WL 200982 (Tex. Ct. App. Jan 27, 2009), did state, in the context of resolving a discovery dispute, that, "[a]lthough the [toxic-soup] mass tort considered here is immature, unlike asbestos litigation, we believe that the [*Borg-Warner*] standard is applicable in this context").

of sheetrock" during construction.[72]  Stephens was a commercial painter who worked in close proximity to sheetrockers; the sheetrockers mixed powdered joint compound with water before application, and then sanded smooth the dried joint compound after application.  Both "the mixing and sanding processes created a great deal of dust."[73]  Stephens painted in the rooms where the sheetrockers worked, and he sometimes mixed and sanded joint compound himself.  Frequently, Stephens swept up the joint compound dust created by the sanding process before he began painting, which would raise clouds of dust so that "there would be dust in the air and on [his] person[]."[74]  Thus, it is certain Stephens was regularly exposed to and inhaled joint compound dust.

With regard to the brands of joint compound to which Stephens was exposed, the evidence at trial was that as many as ten different brands were used at job sites where he worked.[75]  One of these brands was "Bestwall," manufactured by Georgia-Pacific.  Between 1965, when Georgia-Pacific acquired Bestwall, and 1977, when Georgia-Pacific changed the Bestwall formula, the product "contained between two and eight percent chrysotile asbestos."[76]  Thus, it was virtually certain that, during his career, Stephens was exposed to *some* level of asbestos contained in the Bestwall joint compound product manufactured

---

[72]  *Id.* at 306.  Sheetrock is more commonly known as wallboard, plasterboard, or drywall. "Sheetrock" is a brand of drywall manufactured by the United States Gypsum company, and the term has become generically synonymous with drywall (like the term "Kleenex" for facial tissue).  The *Stephens* court uses the term sheetrock generically, so this Court follows suit.

[73]  *Id.*

[74]  *Id.* at 314.

[75]  *Id.* at 312-14, 318-319.

[76]  *Id.* at 306.

by Georgia-Pacific.[77]  Beyond that, however, there was no evidence at all of *how much* of Stephens' exposure to asbestos was attributable to Bestwall joint compound.  For example, there was "no evidence concerning the percentage of Georgia-Pacific joint compound used in comparison to the quantity of other products used on [Stephens'] job sites, nor any quantitative estimate of the number of times Georgia-Pacific joint compound was used on [his] job sites."[78]

With regard to the question of how much exposure to asbestos it took to cause mesothelioma, Stephens' experts were also inexact.  For example, one expert "did not testify as to the minimum level of exposure to asbestos dust from joint compound that could lead to an increased risk of mesothelioma."[79]  Instead, he testified only that Stephens' exposures to Georgia-Pacific joint compound "were at a level and of the type that are known by industrial hygienists to contribute to the development of asbestos-related disease," based on studies that "detected asbestos fibers in excess of OSHA's permissible exposure limits during joint compound mixing and sanding operations."[80]  The expert could not "estimate the amount of time [Stephens] was exposed to joint compound generated asbestos dust in excess of OSHA permissible levels," but opined that "every [asbestos] exposure does contribute to the . . . potential to develop mesothelioma."[81]  Similarly, another expert opined that "each and every exposure that an individual has in a bystander occupational setting causes their mesothelioma," and that, while a threshold exists "above

---

[77]  Stephens was also exposed to two other joint compound products manufactured by Georgia-Pacific, but the record did not suggest those products contained asbestos.  *Id.* at 318-19.

[78]  *Id.* at 319; *see id.* at 318 (Stephens' "expert witnesses were unable to estimate [his] exposure to Georgia-Pacific joint compound").

[79]  *Id.* at 314-15.

[80]  *Id.* at 314.

[81]  *Id.* at 315.

which you may be at risk, below which you may not be at risk," he could not define that threshold.[82]

In light of Stephens' experts' inability to quantify how much asbestos exposure is required before an increased risk of harm will result, or how much asbestos exposure Stephens suffered that was attributable to Georgia-Pacific, the *Stephens* court concluded Stephens had not carried his burden of showing specific causation.  The court explained:

> Each of the experts acknowledged at trial that mesothelioma, like asbestosis, is dose responsive – some non de minimus [sic] occupational exposure must occur to increase one's risk of developing the disease.  Although the lay testimony presented at trial is sufficient to show that [Stephens] worked in close proximity to asbestos-containing joint compound generally, it is legally insufficient to show that [Stephens] frequently and regularly worked in close proximity to Georgia-Pacific joint compound so as to be exposed to enough of its asbestos to increase his risk of developing mesothelioma.  The record does not contain any quantitative estimate of [Stephens'] exposure to Georgia-Pacific's joint compound, as [his] experts conceded.  * * *
>
> Without quantitative evidence of exposure and any scientific evidence of the minimum exposure level leading to an increased risk of development of mesothelioma, we hold that the opinions offered by the [Stephens'] experts in this case lack the factual and scientific foundation required by *Borg-Warner* and thus are legally insufficient to support the jury's causation finding.[83]

This remained true even though "the literature and scientific studies [Stephens'] experts relied upon support a reasonable inference that exposure to chrysotile asbestos can increase a worker's risk of developing mesothelioma."[84]

In addition to observing that Stephens' evidence did *not* rise to the necessary level of proof, the

---

[82]  *Id. See also id.* (another expert opined that "mesothelioma, like other asbestos diseases, is a dose-responsive disease – the lower one's exposure to asbestos, the less likely one is to develop mesothelioma," but she "could not offer an opinion as to the level of exposure that would be low enough such that the exposure could not be considered a cause of mesothelioma in an individual").

[83]  *Id.* at 321 (footnote omitted).

[84]  *Id.*

*Stephens* court also commented on other cases where, in contrast, the evidence *had* been sufficient.[85]  In *Rotondo v. Keene*, for example, the "frequency-regularity-proximity test [was] met where [the] evidence showed that [the] plaintiff worked in [a] boiler room at least two days per week for at least three to four months, and pipecoverers used [the] defendant's asbestos-containing product in [the] boiler room fifty percent of [the] time."[86]  Similarly, in *Goss v. American Cyanamid Co.*, the frequency-regularity-proximity test [was] met where [the] plaintiff testified that 'most' [of the] asbestos pipe covering he used was manufactured by the defendant, and [a] coworker testified that he used defendant's pipe covering approximately ninety percent of [the] time and installed it in areas where plaintiff regularly worked."[87]  Indeed, the *Stephens* court even noted it did not mean "to suggest that the levels of exposure evidenced *in this case* could never be proved to increase the risk of developing mesothelioma."[88]  Rather, a different result could obtain if the necessary evidence of quantification required under *Borg-Warner* had been adduced.  Because Stephens had argued at trial that "'any exposure' leads to an increased risk of mesothelioma," and had not presented any quantitative evidence, however, the jury's verdict had to be reversed.

Having examined Texas law as set forth in *Borg-Warner* and *Stephens*, the Court now applies these rulings to the instant case.

---

[85]  *See generally id.* at 319-20.

[86]  *Id.* at 320 (citing *Rotondo v. Keene*, Corp., 956 F.2d 436, 442 (3rd Cir. 1992).

[87]  *Id.* (citing *Goss v. American Cyanamid Co.*, 650 A.2d 1001, 1006 (N.J. Super. Ct. 1994)

[88]  *Id.* at 321 n.11 (emphasis added).  The *Stephens* trial occurred before the *Borg-Warner* opinion was issued.

**B.      Byers' Quantitative Evidence.**

In this case, each defendant argues that the evidence Byers developed regarding his exposure to their particular products does not meet the *Borg-Warner* test, as a matter of law.  Turning to the easiest questions first, the Court quickly concludes that six defendants – BOC, TDY, Union Carbide, Eutectic, Sandvik, and Westinghouse – are correct, and so are entitled to summary judgment under Texas law.

As *Borg-Warner* makes clear, to find against a defendant in this case, the jury must be presented with "evidence of the approximate quantum of [manganese in welding fume] to which [Byers] was exposed, and whether this sufficiently contributed to the aggregate dose of [manganese fume that Byers] inhaled, such that it could be considered a substantial factor in causing his [neurological injury]."[89]  In this case, there is no material question of fact as to whether the quantum of welding fumes given off by the products manufactured by each of these six defendants could be considered a substantial factor in causing Byers' alleged injury – it could not.[90]

For example, Byers used defendant BOC's welding rods during only one job in 1981, and also possibly as a child while welding with his father.  There is no evidence that the BOC welding rods Byers used during this 1981 job emitted fumes that were especially copious, or had an unusually high manganese content; nor is there any evidence that he was exposed to these fumes while in a confined space with no

---

[89]  *Borg-Warner*, 232 S.W.2d at 772.

[90]  As the Court stated in its oral ruling from the bench before trial: "The Court also concludes that the Defendants' motion for summary judgment as to those Defendants is well taken.  The Court finds – actually believes it would be well taken under Alabama or Texas law or, frankly, the laws of most of the other states that the Court has considered to date.  The product I.D. and exposure evidence as it relates to those Defendants is insufficient to rise to the level of allowing any reasonable juror to conclude that exposure to the products of those Defendants could be a substantial factor, and cause harm or injury to Mr. Byers.  So the Court finds that the defendant's motion for summary judgment is well taken as to all of those six Defendants."  Pretrial tr. at 42 (Oct. 22, 2008).

ventilation, so that his exposure to BOC welding fumes was especially injurious.[91]  Indeed, Byers essentially conceded during oral argument that, given the evidence he had discovered and adduced, his exposure to BOC welding fumes was fairly characterized as "de minimis."[92]  Thus, it is clear that the "dose" of BOC manganese fumes to which Byers was exposed did not contribute to his "aggregate dose" such that it could be considered a substantial factor in causing his alleged injury.

Similarly, while Byers used Sandvik welding consumables sporadically between 1981 and 1997, the evidence is undisputed that: (1) the only Sandvik products he used were stainless steel TIG products, which are low-fume, low-manganese products; and (2) he did TIG welding for only a small percentage of his welding, and used Sandvik products for only a small percentage of that.[93]  Thus, it is again undisputed that the "dose" of Sandvik manganese fumes to which Byers was exposed did not contribute to his "aggregate dose" such that Sandvik products could be considered a substantial factor in causing his alleged injury.

The same analysis applies to defendants TDY, Union Carbide, Eutectic, and Westinghouse.  Under the *Lohrmann* "frequency, regularity, and proximity" test, "there must be evidence of [1] exposure to a specific product [2] on a regular basis [3] over some extended period of time [4] in proximity to where the plaintiff actually worked" to support a jury determination that the product was a substantial factor in causing injury.[94]  There is no evidence of record in this case of any regular or extended use by Byers of welding rods manufactured by any of these other four defendants.  Accordingly, defendants' motion for

---

[91]  *See* motion (dkt. no. 183) at 15 (summarizing Byers' use of BOC products).

[92]  *See* pretrial tr. at 28-34 (Oct. 22, 2008).

[93]  *See* pretrial tr. at 32-34, 40 (Oct. 2, 2008) (counsel summarizing Byers' use of Sandvik products).

[94]  *Borg-Warner*, 232 S.W.3d at 769 (quoting *Lohrmann*, 782 F.2d at 1162-63).

33

summary judgment must be granted as to BOC, TDY, Union Carbide, Eutectic, Sandvik, and Westinghouse.

The analysis is different and more complicated with respect to defendants Lincoln, Hobart, and ESAB.  In contrast to the sporadic and infrequent use of welding rods manufactured by the six other defendants, Byers used welding rods manufactured by Lincoln, Hobart, and ESAB regularly and often throughout all of his 25-year career.[95]  With respect to each of these defendants, Byers adduced sufficient evidence at the summary judgment stage to submit to the jury the *Lohrmann* "frequency, regularity, and proximity" test, unmodified by *Borg-Warner*.  That is, there is no question but that Byers was prepared to present evidence at trial that he commonly and ordinarily used the welding rods manufactured by each of these three defendants, and he did so for many years.  As such, there existed evidence upon which a reasonable jury could conclude that each of these three defendants' products contributed substantially to the aggregate dose of manganese fume that Byers inhaled.

*Borg-Warner*, however, mandates that Byers provide more than just the information required by *Lohrmann* – he must also provide evidence related to the "quantitative information [of his exposure] necessary to support causation under Texas law."[96]  While this quantitative information need not be mathematically precise, it must be sufficiently finespun to allow a jury to determine: (1) the quantity of manganese fume to which Byers might have been exposed, (2) whether that amount was sufficient to cause neurological injury, and (3) whether the amount of exposure attributable to each defendant was a substantial cause of that alleged injury.  A comparison of the quantitative evidence offered in *Borg-Warner*

---

[95] Testimony was elicited from defense witnesses at trial that these three defendants are the largest welding rod manufacturers, and together own the majority of the market share.  Trial tr. at 511 (Nov. 5, 2008).  Byers testified that "Lincoln and ESAB and Hobart makes up probably 90, 95 percent of everything that I ever used."  *Id.* at 738 (Nov. 6, 2008)

[96] *Borg-Warner*, 232 S.W.3d at 772.

34

and *Stephens* (and the cases they cite), on the one hand, and in Byers' case, on the other hand, convinces the Court that Byers *has* adduced sufficient quantitative evidence to create a jury question on specific causation for each of the remaining three defendants.

First, it is true, as defendants note, that the exact threshold level at which exposure to manganese in welding fumes becomes unsafe is not known; or, as plaintiffs prefer to phrase it, there is no known safe level of exposure to manganese in welding fume. But this is not tantamount to a complete lack of quantitative evidence on the question of whether the amount of manganese fume to which Byers was exposed was sufficient to show increased risk of neurological injury.

As this Court has explained in detail in other written opinions, several governmental and professional entities have established various measures to define safe exposure limits to manganese in welding fumes. These limits include: (1) the Threshold Limit Value ("TLV"), promulgated by the American Conference of Governmental Industrial Hygienists ("ACGIH"), which is the maximum *average* amount to which, it is believed, a person may be safely exposed over an 8-hour time period;[97] and (2) Permissible Exposure Limits ("PELs"), promulgated by the Occupational Safety and Health Agency ("OSHA"), which is the maximum *ceiling* amount to which a person may be safely exposed at any moment

---

[97] The current TLV for manganese fume is an 8-hour time-weighted average of 0.2 mg/mm$^3$. The ACGIH describes a TLV as follows: "[TLVs] refer to airborne concentrations of chemical substances and represent conditions under which it is believed that nearly all workers may be repeatedly exposed, day after day, over a working lifetime, without adverse health effects. TLVs are developed to protect workers who are normal, healthy adults." *See* www.acgih.org/Products/tlv_bei_intro.htm. *See also In re Welding Fume Prods. Liab. Litig.*, 526 F.Supp.2d 775, 784 n.33 & 789-90 n.65 (N.D. Ohio 2007) (discussing the history and meaning of the TLVs and PELs for manganese).

The ACGIH webpage cited above adds: "TLVs do not represent a fine line between a healthy versus an unhealthy work environment or the point at which material impairment of health will occur. TLVs will not adequately protect all workers. Some individuals may experience discomfort or even more serious adverse health effects when exposed to a chemical substance at the TLV or even at concentrations below the TLV."

in time.

While a  welder who is exposed to manganese fume at levels above the TLV or PEL is not *guaranteed* to suffer adverse health effects, the ACGIH believes that such exposures are unsafe and make adverse health effects more likely.  As the ACGIH explained when it lowered the TLV for manganese fume from 1.0 to 0.2 mg/mm$^3$ in 1994, "the available data indicate that a TLV of 0.2 mg/mm$^3$ is needed to prevent progressive neurological changes in workers exposed to manganese."[98]  And as ESAB's current warning label states, "Overexposure to manganese and manganese compounds *above safe exposure limits* can cause irreversible damage to the central nervous system, including the brain."[99]  Thus, there is in this case evidence of a quantitative threshold against which a jury can measure Byers' exposure, together with evidence that exposure above this threshold is sufficient to cause what defendants' own warnings and MSDSs describe as progressive neurological changes – which can include languor, sleepiness, muscular weakness, emotional disturbances, poor coordination, difficulty in speaking, spastic gait, tremor of arms and legs, and irreversible damage to the central nervous system, including the brain.  In sum, Byers has adduced sufficient evidence regarding "toxic threshold" to allow a jury to determine whether a given exposure level to manganese fumes is sufficient to cause the kinds of neurological injury Byers claims to have suffered.

The next question is whether Byers has adduced sufficient quantitative evidence to allow a jury to determine whether, more probably than not, the amount of manganese fume from each defendant's products to which *he* was actually exposed exceeded this threshold.  As noted in its earlier oral rulings on

---

[98]  Letter from ACGIH's Ronald Ratney to Lincoln's Kenneth Brown at 1 (Jan. 3, 1995) (trial exh. 215).

[99]  Trial exh. 1152, exh. O (emphasis added).

defendants' summary judgment motions, the Court concludes this is a close question.[100]  The very best evidence Byers could present on this issue would be air sampling data that showed, at any point during his career, the actual concentrations of manganese fume in his breathing space.  Byers does not point to any air sampling data at all, however, in support of his assertion that his exposures exceeded the threshold level necessary to cause harm.[101]  The next best evidence Byers could present on this issue would be expert testimony detailing a quantitative dose reconstruction, premised upon supportable data and reasonable

---

[100]  Of the three types of quantitative evidence that Byers must adduce – (1) the threshold level to cause injury, (2) whether his actual exposures exceeded that threshold, and (3) defendant-specific exposure levels – the Court struggled hardest with the question of whether Byers met his burden of production of the second type of evidence.  *See* trial tr. at 42-44 (Oct. 22, 2008) (the Court stating, at the final pretrial conference: "At this point, I'm leaning toward concluding that even under *Borg-Warner* it is likely that the motion for summary judgment would be denied without prejudice to any Rule 50 motion after all the testimony as to exposure is played out at trial, but again I haven't made a final decision"); *id.* at 3422-23 (Nov. 21, 2008) (the Court reiterating, in the context of ruling on defendants' Rule 50 motions, that, even though it did not "agree with the defendants' characterization of the extreme nature of the showing that is required under the *Flores* case," it was still "very troubled by the exposure showing that has been made").

[101]  Of course, virtually no welder could ever provide this evidence, which is why the law does not require mathematical precision to show toxic exposure.  As stated by the *Reference Manual on Scientific Evidence*, "[o]nly rarely are humans exposed to chemicals in a manner that permits a quantitative determination of adverse outcomes . . . .  Human exposure occurs most frequently in occupational settings where workers are exposed to industrial chemicals like lead or asbestos; however, even under these circumstances, it is usually difficult, if not impossible, to quantify the amount of exposure."  Federal Judicial Center, *Reference Manual on Scientific Evidence* 405 (2nd ed. 2000).  *See Plourde v. Gladstone*, 190 F.Supp.2d 708, 721 (D. Vt. 2002) ("In most toxic tort cases it is impossible as a matter of practice to quantify with hard proof – such as the presence of the alleged toxic substance in the plaintiff's blood or tissue – the precise amount of the toxic substance to which an individual plaintiff was exposure."); *see also Goforth v. Lincoln Elec. Co.*, case no. 06-CV-17217, trial tr. at 1936, 1941-42 (Nov. 8, 2006) (*Welding Fume* MDL welder-witness testifying his "safety-conscious" employer monitored his welding fume exposure with an air-sampling device two times during his 24-year career).  The Court rejects defendants' arguments in this case suggesting that *Borg-Warner* and *Stephens* require a level of evidentiary precision that the *Reference Manual on Scientific Evidence* calls "difficult, if not impossible," to achieve.

37

assumptions.  Again, however, Byers does not point to this type of evidence.[102]  Rather, Byers points to three types of circumstantial evidence suggesting that his actual exposure levels exceeded the critical threshold: (1) defendants' own documents; (2) an OSHA database; and (3) anecdotal descriptions regarding the type and number of his exposures.

As to documents, Byers highlights the minutes from a 1994 meeting of the American Welding Society ("AWS"), at which was discussed the then-proposed reduction of the manganese exposure TLV from 1.0 to 0.2 mg/mm³.  The AWS meeting minutes state that defendant Lincoln Electric "estimated that if the TLV is lowered to 0.2 milligrams per cubic meter, then the overall welding fume limit . . . *would be exceeded in most workplace atmospheres*."[103]  As noted above, the reduction of the TLV to 0.2 mg/mm³ did, in fact, occur.[104]  Similarly, in a 1995 letter written by Caterpillar, Inc. to the Ferroalloys Association, Caterpillar argued against reduction of the TLV because "approximately 50% [of Caterpillar welders]

---

[102]  Evidence of quantitative dose reconstruction is also elusive, at best.  In the MDL bellwether case of *Solis v. Lincoln Elec. Co.*, case no. 04-CV-17363 (N.D. Ohio), the plaintiff did, in fact, offer expert testimony from an industrial hygienist regarding efforts to reconstruct, in part, the plaintiff's career exposure to manganese in welding fumes.  *See Solis* trial tr. at 1387-1421 (June 8, 2006) (*Daubert* hearing testimony of expert Steven Paskal regarding "work practice simulation studies").  Defendants argued strongly that these attempts to reconstruct the welder-plaintiff's "manganese dose" suffered from numerous procedural and substantive infirmities.  The Court concluded the expert's studies were admissible only "for purposes of supplying [reference] ranges or data points" – the expert could not express an opinion "that [the] exact air ranges or exact air numbers [obtained in the "work practice simulation studies"] are meant to replicate any particular day during Mr. Solis' welding experience." *Id.* at 1420.  *See also id.* at 1650 *et seq.* (June 9 & 12, 2008) (Paskal's trial testimony regarding simulation studies)

[103]  AWS Fumes and Gases Committee meeting minutes at 3 (Oct. 17, 1994) (trial exh. 920) (emphasis added).

[104]  *See In re Welding Fume Prods. Liab. Litig.*, 245 F.R.D. 279, 316 (N.D. Ohio 2007) (in the context of denying certification of a medical monitoring class, reviewing plaintiffs' evidence and concluding that "at least some defendants have recognized that some welder-plaintiffs: (1) are routinely exposed to manganese in welding fumes above safe threshold limits; [and] (2) thereby suffer an increased risk of developing neurological illness due to exposure to welding fumes") (footnotes omitted).

*would be over[-]exposed to manganese* at [a TLV] of 0.2."[105]  Byers asserts these documents are general evidence that welders' exposures to manganese in welding fume above the threshold level are extremely common, to the point of being a phenomenon experienced by the *majority* of welders (and that defendants have long known this to be true).  Byers also points to certain documents and evidence arguably showing that, in fact, welders working in normal circumstances can experience exposures much higher than the threshold level, and workers who experienced exposures lower than the threshold level can develop Manganese-Induced Parkinsonism.

As to the OSHA database, Byers adduces evidence that OSHA agents have traveled to various worksites around the country to audit whether employees, including welders, are experiencing manganese exposures in excess of the legal limits.  OSHA's measurements, which are collected in a database, include manganese exposures endured by welders in all types of circumstances: indoor and outdoor welding, use of high- and low-manganese welding rods, well- and poorly-ventilated conditions, and so on.  Byers' expert's analysis of the OSHA database – which includes thousands of measurements taken over the last 20 years – shows that, as a general matter: (1) about 30% of the welders were, at the time of measurement, experiencing manganese exposure in excess of OSHA's current TLV of 0.2 mg/mm$^3$; (2) about 5% of the welders were, at the time of measurement, experiencing manganese exposure in excess of the ACGIH's current "excursion limit" (recommended absolute ceiling) of 1.0 mg/mm$^3$; (3) welders were about five times more likely to be experiencing manganese exposure in excess of OSHA's current TLV than non-welders; and (4) these statistics have held fairly constant over the duration of the 20-year measurement

---

[105] Letter from Caterpillar's H.K. Thompson to The Ferroalloys Association's Edward J. Klinghorn (Feb. 17. 1995) (trial exh. 33) (emphasis added).

period.[106]

Finally, against this generalized background, Byers offers evidence of his own, particular welding experiences during his life-long career.[107]  This evidence includes circumstances where Byers worked for long hours, worked in enclosed areas, worked without respirators, worked next to other welders and their additional fumes, and so on.  Byers' expert industrial hygienist opines that, when assessed against the generalized evidentiary background painted by the other evidence described above, these circumstances leave "no doubt that Mr. Byers has, over his twenty-seven year welding career, experienced exposures to manganese at various concentrations depending on the specific work, and *at levels that exceeded historical and current regulations, and guidelines*."[108]  Put differently, Byers' expert opines that, based on a reasonable degree of scientific certainty, Byers was repeatedly exposed during his career above the threshold level that marks an elevated risk of harm.

There is one thing that the sum of this evidence offered by Byers clearly is *not*: an approximate, stand-alone, quantitative measure of the total amount of manganese in welding fume he inhaled during his career.  For example, Byers is not offering evidence from which a jury could conclude that he was exposed to manganese fume above 0.2 mg/mm$^3$ during (say) 10% of his working hours; or that he suffered exposure to manganese fume above 1.0 mg/mm$^3$ 50 discrete times in his career.  But, as earlier discussed, Texas law does not require Byers to offer evidence this specific.  The critical passage from *Borg-Warner* is that

---

[106]  *See generally* expert report of Mr. Kahane (docket no. 98); Defendants' Motion to Exclude Certain Testimony of David Kahane (docket no. 184).

[107]  *Id.*  Mr. Kahane's testimony at trial regarding the OSHA background evidence and Byers' individual welding experiences tracked his expert report and deposition testimony.  *See* trial tr. at 1120 *et seq.* (Nov. 7 & 10, 2008).

[108]  Expert report of Mr. Kahane (docket no. 98) at 9 (emphasis added) (also stating "it is probable to a reasonable degree of certainty, applying industrial hygiene principles, that exceeding TLV's [sic] was more than a random occurrence" during Byers' career).

"there must be reasonable evidence that *the exposure was of sufficient magnitude to exceed the threshold before a likelihood of 'causation' can be inferred.*"[109]   In other words, it is sufficient under Texas law for a plaintiff to adduce evidence that: (1) as a general matter, exposure to a toxin at more than a certain, threshold level substantially increases the likelihood of toxin-related injury; and (2) as a specific matter, more probably than not, he was exposed to more than this threshold level of the toxin, and this exposure can be attributed in substantial part to the particular defendant's products.  While it is a close call on the second prong, the Court concludes Byers has offered sufficient evidence addressing both prongs of this test, so he avoids summary judgment.

In *Stephens*, the expert "did not testify as to the minimum level of exposure to asbestos dust from joint compound that could lead to an increased risk of mesothelioma."[110]  Here, in contrast, Byers' expert has opined about the ACGIH's TLV, and defendants' own documents confirm that exposures above this TLV increase the risk of suffering neurological injury.  In *Stephens*, the expert opined only that the plaintiff was exposed to "some" asbestos, and that "every [asbestos] exposure does contribute to the . . . potential to develop mesothelioma."[111]  Here, in contrast, Byers' expert has opined that, given the frequency with which welders suffer exposures above the threshold generally, and given the circumstances of Byers' welding particularly, it is beyond doubt that Byers experienced repeated exposures above the threshold level during his entire career; and defendants' own documents confirm that the TLV will be exceeded in "most workplace atmospheres."  Clearly, the quantitative evidence offered by Byers is more precise than that offered in *Stephens* or *Borg-Warner*.  And, of course, this Court is required to view the

---

[109] *Borg-Warner,* 232 S.W.3d at 773 (quoting David L. Eaton, *Scientific Judgment and Toxic Torts – a Primer in Toxicology for Judges and Lawyers*, 12 J. Law & Policy 5, 39 (2003)) (emphasis added).

[110] *Stephens*, 239 S.W.3d at 314-15.

[111] *Id.* at 315.

41

evidence in a light most favorable to Byers when determining whether a genuine issue of material fact exists.[112]

The Court remains concerned that the sum of the quantitative evidence of personal exposure offered by Byers, although more definite than the quantitative exposure evidence offered in *Borg-Warner* and *Stephens*, is still somewhat indistinct.  For example, while Byers offers evidence and reasonable inferences that he suffered repeated exposures above the threshold  level, which substantially increased his likelihood of injury, he does not offer evidence of how often his exposures exceeded this threshold, or how far above the threshold his exposures were.[113]  Ultimately, however, Byers does far more than simply assert he was exposed to "some" manganese fume, and it was this approach that the Texas Supreme Court rejected.  Byers offers quantitative evidence that he was, more likely than not, repeatedly exposed to manganese in welding fumes above the TLV during the course of his long career.  This satisfies the *Borg-Warner* requirement that a plaintiff provide enough specific information to allow a jury to determine whether, more probably than not, his exposure was sufficient to cause neurological injury.

This leaves the third type of quantitative evidence required by *Borg-Warner* – evidence that allows a jury to determine whether the amount of exposure *attributable to each defendant* was a substantial cause of the alleged injury.  In *Borg-Warner*, the plaintiff did not "introduce evidence regarding [the] percentage of [the asbestos to which he was exposed that] may have originated in Borg-Warner products."[114] Similarly, in *Stephens*, there was "no evidence concerning the percentage of Georgia-Pacific joint

---

[112] *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).

[113]   The fact that Byers was a career welder for over 25 years assuages the Court's concern somewhat regarding the sufficiency of Byers' quantitative evidence of personal exposure.  The longer a welder's career, of course, the stronger the inference that he suffered repeated exposures above the threshold level.

[114] *Borg-Warner*, 232 S.w.3d at 772.

compound used in comparison to the quantity of other products used on [Stephens'] job sites, nor any quantitative estimate of the number of times Georgia-Pacific joint compound was used on [his] job sites."[115]  Here, in contrast, Byers has evidence quantifying the number of jobs where he used the products made by remaining defendants Lincoln, Hobart, and ESAB, as well as the relative overall percentages attributable to each defendant.[116]  The *Stephens* court commented that this type of quantitative evidence can meet the frequency-regularity-proximity test, as modified by *Borg-Warner*.[117]  The Court concludes that Byers has adduced sufficient defendant-specific evidence to allow a reasonable jury to determine whether each defendant was responsible for a substantial amount of Byers' total exposure to manganese fume.

## IV.    Conclusion.

As an initial matter, the Court concludes that this case is governed by Texas law.  Under Texas law, the motion by defendants BOC, TDY, Union Carbide, Eutectic, Sandvik, and Westinghouse for summary judgment, based on lack of evidence of specific causation, is **granted**; however, the same motion by defendants Lincoln, Hobart, and ESAB is **denied**.

**IT IS SO ORDERED.**

/s/ Kathleen M. O'Malley
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED**: March 20, 2009

---

[115]  *Stephens*, 239 S.W.3d at 319.

[116]  At trial, Byers testified that these relative percentages were: Lincoln – 40%, ESAB – 35%, and Hobart – 25%.  Trial tr. at 738 (Nov. 6, 2008).

[117]  *Stephens*, 239 S.W.3d at 319-20 (citing cases where similar relative percentages were found sufficient to meet the frequency-regularity-proximity test, as modified by *Borg-Warner*.